John H. CRUMADY, Libellant,

v.

THE JOACHIM HENDRIK FISSER, her engines, tackle, apparel, etc. Respondent,

and

Nacirema Operating Co., Inc., Respondent-Impleaded.

Civ. A. 1–54.

United States District Court
D. New Jersey.

June 27, 1956.

Brass & Brass, by Sidney Brass, Newark, N. J., Proctors for libellant.

Charles N. Fiddler, and Frederick H. Cunningham, by Victor Cichanowicz, New York City, Proctors for respondent.

Stryker, Tams & Horner, by John J. Monigan, Jr., Newark, N. J., Proctors for respondent-impleaded.

WORTENDYKE, District Judge.

This admiralty suit was instituted by libel in rem for damages, civil and maritime, for bodily injuries and their consequences, resulting from the fall of a cargo boom serving hatch No. 1 on the motor vessel Joachim Hendrik Fisser, of German registry, while lying in navigable waters of the United States, within the jurisdiction of this Court, at a pier or bulkhead at Port Newark, New Jersey, on January 2, 1954.

The vessel impleaded as a respondent libellant's employer, Nacirema Operating Co., Inc. (herein called Nacirema), the stevedore contractor which was discharging the vessel's cargo at the time of the occurrence complained of.

The injuries were inflicted during the course of discharge of a cargo of lumber and timbers from the forward (No. 1) hatch of the vessel by libellant's fellow-employees. The discharging operations had commenced about an hour before the offending occurrence, during which time certain drafts of lumber had been discharged by means of the so-called "up-and-down" boom and Burton boom from the hatch of the vessel to the pier. The booms and tackle had been initially rigged by the ship's crew but before the operation in the course of which libellant was injured the stevedores had altered the position of the head of the up-and-down boom and the places of fastening of its guy and preventer. The discharging instrumentalities, including the winches, were being handled by libellant and his fellow-employees.

When the accident occurred the stevedores were in the course of discharging from the hatch two timbers, lying fore and aft of the hatch, estimated in dimensions at from 8″ x 8″ to 12″ x 12″ in girth and from 30 to 37 feet in length. One of these two timbers lay upon the cargo within the open square of the hatch, while the other timber lay beneath and entirely or partly outboard of the outboard-curving lower edge of the starboard hatch coaming, the top surface of the latter timber being close to the edge of the coaming and beneath the deck. In an effort to bring the two timbers together and into the open area of the hatch square, libellant and his fellow-employees had placed a double-eyed wire rope sling, provided with a sliding hook movable between the eyes thereof, around the two timbers at a location two or three feet from their after ends. The two eyes of the sling were then placed upon the cargo hook of the up-and-down boom runner and a signal given by the stevedore gangwayman to the winchman to "take up the slack". The winchman complied with the signal, and during this operation libellant stood clear upon other timbers forming a part of the cargo, within the open square of the hatch. There was some testimony that when the slack was taken up by the winchman, the two timbers slid toward each other in the sling, the timber which had been under the lower edge of the hatch coaming moving or commencing to move toward the timber which lay within the open hatch square. After the slack had been taken up by the winchman, the same signaller called for the "taking of a strain" upon the cargo runner. The winchman again responded, the two-part topping-lift broke and the head of the up-and-down boom, with its attached cargo and topping-lift blocks, fell to the top of the cargo within the hatch square.

The topping-lift had been rigged in a double purchase and had been supporting the head of the boom. The wire rope constituting the topping-lift extended from a shackle on the topping-lift block at the cross-tree of the mast, through a block at the boom head, back through the mast block, down the mast, through a block welded to the mast table, and thence around a drum of the winch. When the boom fell, libellant was knocked down, either by the boom itself or its appurtenant tackle, and thus sustained numerous serious and permanently disabling orthopedic and neurological injuries.

Alleging that he was impliedly invited by the vessel and her owner to participate in her unloading, libellant charges that his injuries proximately resulted from the negligence of such owner, its agents and servants, and from the unseaworthiness of the vessel. More particularly, libellant asserts that the topping-lift which parted and permitted the boom to fall was, to the knowledge of the vessel's owner, "worn, frayed and damaged", and that "the equipment attached to * * * the boom * * * was insufficient, defective, inadequate and unsuited to handle the transfer of said cargo."

Libellant's employer is impleaded as a respondent upon the vessel's contention that the sole cause of the breaking of the topping-lift, and the consequent fall of the boom, was the active negligence or improper conduct of the libellant's fellow employees in the handling of the cargo and unloading gear. By reason thereof the vessel seeks indemnification under the 56th Admiralty Rule.

At the commencement of the trial, the following facts were stipulated: (1) the topping-lift cable (which admittedly parted and permitted the boom to fall) had been rigged and installed following the launching of the vessel in June 1952, and had not been replaced prior to the accident here involved; (2) the port or up-and-down boom winch, which was being operated at the time the topping-lift cable parted, had also been installed following the launching of the vessel, and had a rated three-ton capacity, with 18 German horse-power; (3) this winch was equipped with a device which automatically interrupted its operation upon the application of a burden exceed-

ing the capacity of the winch; (4) the vessel and her loading gear had been inspected by a ship's surveyor on June 5, 1952, and there had been subsequent annual inspections of such gear.

■ It is elementary that the vessel owed libellant longshoreman the non-delegable obligation of seaworthiness. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Alaska Steamship Co., Inc., v. Petterson, 347 U.S. 396,

74 S.Ct. 601, 98 L.Ed. 798. This obligation required only that the vessel and its equipment "be reasonably fit for the use for which it was intended". Berti v. Compagnie De Navigation Cyprien Fabre, 2 Cir., 213 F.2d 397, 400.

## The Topping-Lift

■ The topping-lift which supported the boom before it fell had been installed in its position at the time the vessel was originally rigged in May or June, 1952. There was much evidence about the topping-lift which parted.[1] I find that

1. There were two sets of exhibits of wire rope, each set purporting to consist of pieces of the topping-lift which parted and permitted the fall of the boom. Libellant offered L–10 and L–13; respondent vessel offered R–38 and R–39–a, b and c. L–10 and L–13 are respectively two pieces of obviously rusty wire rope consisting of six strands around a center hemp core, each strand consisting of 19 individual wires around a smaller hemp center. L–10 is a piece approximately 5 feet in length, having a diameter of 7/8 of an inch and a circumference of 2–1/2 inches, one of the ends of which has been subjected to some crushing or pinching force, but the strands at this end are not unravelled. For a distance of about 18 inches from the other end the strands are unravelled and the individual wires of some of the strands are unravelled from their center cores. This exhibit is corroded throughout, the hemp cores are completely dry, the individual wires are brittle and break readily when bent with the fingers. There is no evidence of any internal or external lubricant or preservative upon the exhibit. L–13 is apparently a piece of the same type of wire rope, approximately the same length as L–10, and manifests the same characteristics of corrosion, dryness, brittleness and the absence of lubricant or preservative. The strands for some distance from each end of L–13 have been unravelled and the center core of the exhibit has been exposed for a distance of about 18 inches.

All witnesses who testified after an inspection or analysis of each of these exhibits (L–10 and L–13) were of the opinion that the exhibits manifested conditions of such deterioration as to render them unsuitable and dangerous for use as a topping-lift or as any other element of standing or running gear of the cargo handling facilities of which the fallen boom in this case was a part. Sev-

eral witnesses testified for libellant that these two exhibits formed parts of the topping-lift which parted and permitted the fall of the boom which injured libellant. Costa, the head foreman of Nacirema (libellant's employer) testified that, shortly after the boom had fallen, he found L–10 lying on the deck of the vessel between the two winches which served hatch No. 1, and that he made comparison and found it similar to the part of the topping-lift which extended out from the drum of the port winch and hung over the block which was welded to the mast table near the winches. The witness showed this piece of wire rope to a representative of Travelers Insurance Company who was on the pier at which the vessel was moored and at whose suggestion the witness placed the exhibit in the trunk of his automobile and ultimately transported it to his home, where he kept it in his garage until October 5, 1955, when he turned it over to another representative of the same insurance company.

Another fellow-employee of libellant, one Dominguez, classified as a gearman for Nacirema, whose duty it was to supply the stevedore gangs with articles of gear for their use, was requested by libellant's foreman to cut off a piece of the broken topping-lift which protruded from or hung over the welded block at the base of the mast, in order that the sample might be used as evidence. This witness testified that he accordingly cut off the piece as directed and gave it to another fellow-employee of libellant, one Willie Smith, by whom the cut piece of wire rope was delivered to libellant's attorney who retained custody of it (except during periods of its submission to metallurgical and chemical tests) until it was marked L–13 in evidence upon the trial. Holmes, another member of libellant's gang, identified the exhibit as the piece which he saw Dominguez cut off

the portion of broken topping-lift shown in the photograph L–12. Some further corroboration may be found in the testimony of longshoreman Breitenbach of libellant's contention that L–13 is a piece of the topping-lift which broke. Dominguez further testified that this piece (L–13) appeared to be the same in size, color and condition as the topping-lift from which he says that he cut it.

Willie Smith, another of libellant's fellow-longshoremen, testified that he gave L–13 (the piece which Dominguez cut from one end of the broken topping lift shown in the photograph L–12) to libellant's attorney and that its appearance, when it was marked in evidence on the trial, was the same as it had been when he gave it to the attorney. Smith also testified that the same two pieces of timber which were being handled when the boom fell were successfully removed from the same positions two days later in a similar manner, but without difficulty.

On cross-examination this witness admitted that there was not clearance enough between the top of timber No. 2 to permit it to be rolled and, therefore, that it was necessary to slide it from under the lip of the coaming. (If the timber was 10″x10″ in girth and it were to be rolled, its diagonal would be slightly over 14 inches.) Smith admitted that when he heard the warning of the falling boom he did not have time to notice whether timber No. 2 had jammed against the coaming lip.

Another fellow-employee of libellant, Mason, who was working with him on the inshore side of hatch No. 1, testified that when they initially addressed themselves to the two timbers one was partly under the coaming and the other under the lip of the coaming. He and his fellows pulled the first timber out into the square of the hatch and then turned it over once. Libellant then pried up the second timber which, before the insertion of the pry bar, appeared to have a clearance of 3 inches between the top of the timber and the lip of the coaming. When libellant had thus pried up the timber, Mason inserted a piece of wood beneath it about a foot and a half from its after end, timber No. 1 having already been elevated by the insertion beneath it of another piece of wood. Mason then placed the sling upon the cargo hook. He says that then he made an observation to determine whether all was clear and noted that the clearance between timber No. 2 and the lip of the coaming was less than the three inches which had previously existed. It was Mason who then

signalled to the winchman first to take up the slack and then to take a strain. He says that both timbers then commenced to move toward the open hatch square, and, when a member of the deck crew cried out a warning that the boom was falling, the timbers were still moving slightly. Another member (Strother) of libellant's work gang says that the taking of the strain caused timber No. 1 to move toward timber No. 2. Mason emphatically stated that there was no jamming of timber No. 2 whatsoever, and that it never touched the coaming nor the lip thereof. He also identified the obviously torn end of the wire rope shown in photograph L–12 and says that it was a portion of the topping-lift which separated and was similar in color and size to the piece of wire rope marked L–13. He also corroborates Smith's testimony to the effect that both timbers were removed two days later by the same procedure.

The witness Sasson, Nacirema's superintendent, was not present when the boom fell, but arrived some 15 minutes thereafter. He testified that Costa showed him a piece of cable which was black on the outside and rusty within, and similar in appearance to L–10. He found the sling still around the timbers, observed that there was clearance between timber No. 2 and the coaming lip, and noticed no evidence of jamming on the timber or of damage to the sling. He says that the piece of topping-lift which hung from the block at the cross-tree of the mast was similar in size and color to L–10. This witness also testified that the two timbers remained in the same respective positions in which they were when the boom fell until they were removed from the hatch on Monday, two days later, and that, in the interval, the topping-lifts on both the port and starboard booms serving hatch No. 1 had been replaced by the vessel's crew.

One James Walker, business agent of the union to which libellant and his fellow-employees belong, came to the scene of the accident in response to a telephone call from Breitenbach and arrived after the libellant had been removed to the hospital. Walker observed that the sling was still about the two timbers, one of which was under the lip of the coaming and the other in the hatch square but both of which were close together. He inspected this sling and found no damage to it, taking no note of any damage to either of the timbers. Walker says that at the time of his inspection there was a clearance of approximately one and a half inches between timber No. 2 and the lip of the coaming and clear-

ance of over one inch between the sling and the coaming lip. He says he found no evidence of jamming of the timber against the coaming lip. This witness further testified that he saw one end of the topping-lift hanging from the mast block at the cross-tree, and another piece at the bottom extending over the mast table block as shown in the photograph L–12. While he was in the vicinity the witness Smith showed him a piece of what he said was the topping-lift and which was later given to libellant's proctor (L–13). It was this witness (Walker) who called Mr. Brass, the proctor for libellant, who arrived on board at about 11:00 a. m., and proceeded to take the numerous photographs which have been marked in evidence in behalf of the libellant.

On the afternoon of the same day (January 2, 1954) the vessel and her gear were jointly inspected by Captain George N. Axiotes, as Surveyor for Nacirema, and Otar Grundvig, as Surveyor for the vessel. Axiotes says that the standing part of the broken topping-lift was hanging from the upper mast block, that it was three-quarters of an inch in diameter and that its condition and appearance was similar in all respects to exhibit L–13. He also saw the sling still about the two timbers in the hatch with one eye attached to the cargo hook and reports no damage to the sling or evidence of damage to the after end of timber No. 2. This witness did admit that there was a mark upon this timber resembling the paint on the coaming edge, but says that it evidently did not result from loading or unloading, but probably was due to some contact between the edge of the timber with the edge of the coaming. His measurement of the end of each of the timbers indicated that their dimensions were 8"x8". This surveyor was of the opinion that if there had been a jamming of the timber against the coaming the topping-lift would be the last part of the gear to let go and that if more than a three ton load had been imposed upon the winch, it would have stopped automatically, according to information given him by the vessel's first officer who accompanied him during his inspection.

Each of the winch operators testified. The testimony of Harps who operated the up-and-down boom winch is elsewhere hereinafter reviewed. Crowther, the operator of the starboard winch at the time the up-and-down boom fell into hatch No. 1, says that his winch was not in operation and he was standing by the machine smoking. He it was who cried out

when he saw the boom coming down, and later he saw Costa with a piece of rusty wire cable in his hand which he said is L–10 and resembled the broken end of the topping-lift which he observed hanging over the block welded to the mast table.

Several witnesses in behalf of the respondent vessel denied that L–10 and L–13 were pieces of the topping-lift which parted, but that, on the contrary, Exhibits R–38 and R–39–a, b and c constituted portions of the wire rope which formed the topping-lift at the time the boom fell. There seems to be no contradiction that the topping-lift which was in position at the time the unloading operations were turned over to libellant and his fellow stevedores, was rigged substantially in the manner exemplified in the model of a portion of the vessel, marked R–13 in evidence. According to respondent's witnesses, one end of the topping-lift terminated in an eye surrounding a thimble which was secured by a shackle to the bottom of a single-sheave block at the cross-tree of the mast, thence extended through the single-sheave block at the head of the boom, thence back through the sheave of the first mentioned block, thence down the mast and through a block welded to the mast table near the port winch, and thence around a drum of that winch. These witnesses say that the topping-lift (which was installed when the vessel was launched, and which admittedly parted at the time of the fall of the boom on January 2, 1954) was composed of mild plow steel wire rope, of 6x24 construction, with a hemp center in each strand and a hemp core in the midst of the strands. This rope was 5/8" in diameter and 2" in circumference. This circumferential measurement was indicated for the topping-lift on the rigging plan which was marked exhibit R–40 in evidence, and to which the captain of the vessel (Peters) says her rigging conformed when she was fitted out after launching.

R–38 is a piece of 6x24 wire rope, approximately six feet in length, at one end of which the strands are widely unravelled, and, for a longer distance from that end, one of the strands has apparently been manually unravelled from the remaining strands in their normal position. The opposite end of this exhibit is prevented from unravelling by a temporary serving of twine and its strands and wires appear to have been manually cut. The other end of the exhibit indicates that the strands and wires parted under strain. Throughout its length this exhibit, and also R–39–a, b and c, are black

in color, and evidently have been covered with grease which still comes off readily on the hands of one who handles them. While the individual wires at the end of this exhibit have apparently parted under strain and show some corrosion, the corrosion appears to be of a character and degree which would normally take place during the period between January 2, 1954 and the time of trial. The exhibit exposes for some distance from the end the center hemp core of the rope which is also greasy to the touch and by observation. R–39–a is obviously another portion of the same rope of which R–38 originally formed a part. The latter exhibit is approximately 24 feet in length, one end of which is in the form of an eye surrounding a steel thimble, and the opposite end apparently has been manually cut and is served with wire. R–39–b and R–39–c are seemingly pieces of the same wire rope of which the other exhibits formed a part. R–39–b consists of a piece approximately four feet long, evidently manually cut at each end, one end of which is served with wire and the other is unserved, but neither end of which is unravelled, while R–39–c is a short piece of what is said to be the same rope as that from which the other pieces were taken. This exhibit is not unravelled, is served with wire at one end, and with twine at the opposite end and between the ends. There was testimony (necessarily uncontradicted) that another portion of the topping-lift, of which respondent contends exhibits R–38 and R–39–a, b and c were parts, was taken to Bremerhaven, Germany, the place at which the vessel was built, for purposes of testing, and was not subsequently returned to this country.

Peter Peters, the Captain of the vessel (who was, with his First Mate, Herman Buss, in his quarters just abaft the No. 1 hatch at the time of the accident), testified that he heard the noise of the fall of the boom and immediately came out, with his First Mate, and inspected the conditions at the scene. He saw the boom lying on the cargo and the libellant lying near the boom. He also observed the two timbers (above referred to as No. 1 and No. 2) surrounded by the sling. One eye of the sling was still attached to the cargo hook. The Captain says that he and Buss inspected the two broken ends of the topping-lift; one of which was hanging down the mast and the other was lying on the deck at the foot of the mast. He describes the topping-lift as in good condition, black in color and covered with grease which had been applied to preserve it. He identifies R–38 and R–39–a, b and c as being pieces of the topping-lift which parted, and which, like these exhibits (so found by the Court's actual measurement) were 2″ in circumference. Captain Peters was assigned to the vessel while she was in course of construction at Bremerhaven, Germany, in November 1951, and he testified that the topping-lift which parted on January 2, 1954 at Port Newark, New Jersey, was the same topping-lift which had been installed upon the particular boom when the vessel was initially rigged and that the exhibits R–38 and R–39–a, b and c, were actual pieces of that topping-lift taken and kept in the custody of the vessel (and examining experts) from the time they were replaced following the fall of the boom until they were admitted in evidence on the trial. This authentication of identity of these respondent's exhibits with the topping-lift which parted was corroborated by the testimony of the First Mate, who says that, at the request of libellant's witness, Axiotes (who inspected the vessel and her gear shortly after the boom fell) he (Buss) cut off a piece of a strand, about a foot in length, from the portion of the broken topping-lift which was hanging from the mast crosstree. This was then wrapped in a piece of newspaper by Captain Peters and given to Captain Axiotes who placed it in his pocket, after which the two ship's officers and Axiotes had coffee in the Captain's quarters, where libellant's proctor found them upon his arrival, within an hour or so after the accident had occurred. It was later on the same day, according to the testimony of Buss, that the broken topping-lift was removed from the up-and-down boom (as was the topping-lift which served the Burtom boom at the same hatch) and that, because the vessel had no more rope of the same circumference (2″), the two topping lifts were replaced by new wire rope 2½″ in circumference. The broken sections of the topping-lift of the up-and-down boom, according to the testimony of Buss, were placed in a locker on board the vessel where they remained until a portion of one of them was submitted for testing in Germany, and the other portions (R–38 and R–39–a, b and c) were examined and tested in the United States. The piece of strand which Buss says he cut off and which was given to libellant's expert Axiotes, is shown to be missing from R–38. Axiotes confirmed his receipt from Buss of this 12 inch piece of strand.

Olaf Jacobsen, an agent of the vessel, came aboard about an hour before the boom fell and was in the Captain's quarters at the time the accident occurred. He

it was rigged in a double-purchase and consisted of 6 x 24 mild plow steel wire rope 2″ in circumference. Since she had been launched and placed in commission, the vessel had been plying between different ports in the Carribean area and her loading and unloading gear at hatch No. 1 had been in frequent use, handling a variety of cargo loads. The so-called "safe working load" of the boom and of the cargo runner (the latter measuring 2½″ in circumference) was, according to the stipulation of the parties, three tons each. Single wires taken from R-38, and tested by Isaac Stewart, Chief Engineer of the New York Testing Laboratories, disclosed a breaking point of between 158 and 177 pounds. He com-

also observed the position of the boom after it had fallen, and saw one portion of the broken topping-lift hanging from the cross-tree and the other portion lying on the deck. He testified also that both portions of the severed cable were black in color, ⅝″ in diameter and that R-38 and R-39-a, b and c are pieces of the same topping-lift. He testified that one end of R-38 had been manually cut, while the other end of the same exhibit had been broken or torn. The end of R-39 opposite that which formed the eye had also been manually cut. Jacobsen says he found no evidence of corrosion on the broken end of R-38.

Joachen Gimm was the member of the crew of the vessel whose duty, he says, was to apply protective grease to the topping-lift cable periodically. His attention also was attracted to the fall of the boom by the sound thereof and, under the orders of the Mate, he fetched his camera and took photographs of objects and conditions immediately succeeding and at the scene of the accident. He testified that the parted topping-lift was in two pieces, one hanging from the block at the cross-tree on the mast to a point about two or three feet above the deck, and one end of the other piece lying on the deck with its opposite end around the drum of the port winch. He denied that a separate piece of cable similar to either L-10 or L-13 was lying on the deck. He identified R-38 and R-39-a, b and c as pieces of the broken topping-lift which he described as being black in color and composed of wire two inches in circumference, to which he had applied, by hand, with pieces of waste, protective grease two or three weeks prior to the fall of the boom.

Another member of the crew, who participated with Gimm (according to the latter's testimony) in applying the protective grease to the topping-lift, was Carl Heinrichsdorff. His testimony, together with that of August Otto, was taken at Bremen, Germany, under commission upon interrogatories and cross-interrogatories as a witness for the respondent vessel. Heinrichsdorff testified that

he did not know the size of the wire rope constituting the topping-lift on the date of the accident, nor the size of the wire rope constituting the guys or the runner of the up-and-down boom. He did testify that the topping-lift was rigged in a double-purchase involving the use of three blocks, and that the boom stood amidship at the No. 1 hatch when he observed it before the accident. He was apparently not asked what, if anything, he had to do with the maintenance of the topping-lift cable.

Buss, the First Mate, had also joined the vessel while she was being rigged after launching, in May or June 1952, in Bremerhaven, Germany. He testified that the booms at No. 1 hatch were provided with topping-lifts 2″ in circumference, rigged in double-purchase as called for by the rigging plan marked R-40 in evidence, and that there had been no change in or replacement of these topping-lifts between the time of their initial installation and the fall of the boom on January 2, 1954. He corroborated Gimm in testifying that these topping-lifts were treated with preservative every two or three weeks and that the last application of the preservative to the topping-lifts had been made at Puerto Cabezas, Nicaragua, from which the vessel had sailed for Port Newark, New Jersey in December, 1953. Buss testified that the topping-lift had been taken down and inspected by him in May and again in August, 1953. In addition to his emphatic insistence that R-39 and R-39-a, b and c were portions of the topping-lift with which the boom was provided and which parted, Buss denied that wire rope of the size of L-10 and L-13 was ever used for topping-lift purposes on the vessel before the accident involved in this case, and that if the latter exhibits were actually taken from the vessel, they were pieces of mooring line left over from mooring line repairs, which were frequently required by reason of the frequent immersions, exposure and strains attendant upon their use and the impracticality of treatment with lubricant or preservative of wire devoted to such use.

puted the tensile strength of the entire wire rope at 19,600 pounds, representing 80% of the product of the average strength of the individual component wires by the number of the wires. Mr. Stewart defined the safe working load of a rope as represented by one-fifth of its breaking load. Accordingly, the safe working load of R-38 would be approximately two tons if it were rigged in a single-purchase, but its double-purchase arrangement would render it stronger by at least 50%. I conclude, therefore, that the safe working load of the topping-lift with which we are here concerned was at least three tons. It was the opinion of Stewart, as well as that of respondent's witness Otar Grundvig, a Marine Surveyor, who also examined it, that the topping-lift which parted was in good condition and appeared to be "very good wire". On the other hand, libellant's witnesses, John P. Brady, a Chemical Engineer, and Theodore A. Schneider, an Assistant Professor of mechanical engineering, each of whom examined R-38 and R-39 over two years after the topping-lift parted, were of the opinion that the rope was in a condition rendering it unsafe for use as a topping-lift with gear of the rated capacity stipulated for the boom and runner serving No. 1 hatch on the vessel in question. Brady found the exhibits pliable, greasy and dirty, indicating deck and handling wear, manifesting evidence that the wires had been galvanized, with a consequent reduction of tensile strength below what the witness believed would be the factor of safety. Schneider found the wire insufficiently lubricated, its core dry and some evidence of corrosion, conditions which, in his opinion, rendered the wire rope unsafe for use as a topping-lift for the boom.

It was also the opinion of Robert A. Simons, a Marine Engineer and designer of topping-lifts for vessels, that a topping-lift should be equal to or greater than the cargo runner in diameter and circumference.

Walter J. Byrne, Industrial and Marine Safety Consultant (who with Simons also testified for the respondent-impleaded), said that he had never seen a two-part topping-lift of wire rope ⅝" in diameter on any vessel, although he had inspected thousands. Byrne considered a topping-lift *running* rather than *standing* gear because of its function to raise and lower, as well as to hold, the boom, and he disapproved of the use of ⅝" wire rope as a topping-lift, rigged in a double purchase. Byrne admitted, however, that there was nothing wrong with a two-part topping-lift, provided the size of the rope was appropriate, and he added that a ⅝" wire in one position could be stronger than an inch wire in another position.

Since I am persuaded that the topping-lift which failed, and its condition, is exemplified in the exhibits R-38 and R-39, and since the testimony is uncontradicted that that topping-lift had been in use since the initial rigging of the vessel in June 1952, apparently with the same boom and a cargo runner of the same rated capacity as at the time of the accident, I find that the topping-lift and its manner of rigging, which was in use just prior to the fall of the boom, was adequate and proper for the loads for which the rest of the gear was designed and intended.

### The Port Winch

I am satisfied by the evidence in this case that, just prior to the fall of the boom which caused the libellant to sustain injuries, power was being furnished to this up-and-down boom by the port winch, which was located just forward of hatch No. 1, and which was being operated (as was the starboard winch which powered the Burton boom) by a fellow-employee of libellant.

The operation of the winch which served the boom which fell is disclosed by the testimony of Winchman Harps, another employee of Nacirema, who tells us that when Mason signalled to him to take up the slack, he moved the control lever slightly and then stopped, presumably responsive to a further signal. Mason then signalled for the taking of a strain and Harps pushed the operating

lever slightly further forward but not to a degree which would apply full power to the motor. It was upon this second power application that the topping-lift parted and the boom fell. Harps says that he saw the portion of the broken topping-lift disclosed in the photograph L-12 and that it had an appearance and was in a condition similar to that of the pieces of wire rope marked L-10 and L-13 respectively.

As stipulated at the commencement of the trial, this port winch was provided with a device set to interrupt its operation when a load or burden in excess of its capacity was imposed upon it. More specifically, in answer to interrogatory numbered 29 of those propounded by the respondent-impleaded to the vessel, requesting specification whether the winch "contained a device by which its operation ceased upon the application of a burden in excess of its capacity," the vessel responded affirmatively. The First Mate, Buss, testified at length with respect to the nature and manner of functioning of the so-called "cut-off" device to which the interrogatory referred. Using a diagramatic illustration upon the blackboard, Buss explained that the winch, rated at 18 German horse power, was driven by electricity, the current being applied through a rheostat which regulated the quantity of the current flowing through the motor. As the Court understands the First officer's explanation, the "cut-off" device consisted of a circuit breaker, actuated by an induced magnetic current. Transmission of the power from the motor was controlled by a lever actuating a clutch arrangement. When the lever was pushed forward by (away from) the operator of the winch, the draft on the cargo runner was raised or hoisted, and when the lever was pulled backward (toward the winch operator), the draft was lowered. The vertical position of the lever, while permitting the motor to continue to run, kept the clutch in neutral, so that the drums on the winch did not receive the torque of the motor.

Libellant and his fellow-employees Mason, Strother and Smith were working on the inshore side of No. 1 hatch, and, between the time of the commencement of their work that morning and the time of the fall of the boom, they had been "building" lumber, i. e. piling or making-up drafts which were picked up by slings attached to the hook on the runner. At about 9:00 a. m., the stowed timber cargo in the hold of No. 1 hatch had been lowered to a point below the level of the deck, and libellant and Mason then undertook to prepare for removal two timbers which lay longitudinally of the vessel, in the hold, and which measured between 30 and 35 feet in length and (as estimated) 8″ x 8″ or 10″ x 10″ in girth. One of these timbers lay within the open square of the hatch, while the other lay with its after end to the inshore side of the under-curving lip of the starboard hatch coaming, two or three feet forward of the after coaming of the hatch, the forward end of this timber lying near the forward end of the hatch and well below the lip and edge of the starboard coaming. Libellant, with a crow or pinch bar, had pried up the after end of the timber which was beneath the deck, and his fellow employee, Mason, then put a wooden chock beneath the timber. Libellant then removed the bar, and his partner then placed a wire rope sling (furnished by the stevedore contractor and similar in appearance to IR-1 in evidence) around that timber and also around the timber which lay within the open square of the hatch, so that the sling passed around both timbers at a point approximately one foot forward of their respective after ends. Mason says he then looked at the inshore timber to see whether it would clear the coaming and then hooked the eyes of the sling on the hook at the end of the cargo runner. Thereupon, according to the testimony of libellant, in which he was generally corroborated by Mason, they both stood clear of the timbers at a distance of about six or seven feet, and Mason signalled to the port winchman to "take up the slack". Mason says that

the winchman responded appropriately and was then stopped by a further signal from him. Mason next signalled to the winchman to "take a strain". Mason says that, upon the response of the winch to the latter signal, the sling tightened and the timber which was inshore of the hatch coaming commenced to move towards the square, when suddenly a cry was heard from someone on deck to "look out", and, while the timber was still moving slightly, the boom fell upon the cargo in the hatch square, and the block or blocks at the head of the boom struck and knocked libellant down. Both libellant and Mason say that the inshore timber did not "jam" against the edge of the lip of the starboard coaming, and that before the slack was taken up by the winch operator, there appeared to be a clearance between the timber and the edge of the coaming of something under three inches.

Victor Harps, the operator of the port winch (who was another fellow-employee of libellant), testified that when Mason put the eyes of the sling on the cargo hook, he signalled to him to take up the slack, and that he did so, and then stopped. Upon the signal for the taking of a strain, the winch operator applied more (but less than full) power, and thereupon the boom and the topping-lift fell. The winchman says that as soon as he applied the strain he heard the other winchman holler and saw the boom fall. Harps said that one of the members of the vessel's crew had showed him a switch by means of which he could shut off the power of the winch, but he had received no instructions from anyone how to operate the winch.

Edward Crowther, the operator of the starboard winch, testified that his attention was first directed to the falling of the boom when he heard a noise and looked around. This winchman had previously slacked off his winch when the up-and-down cargo hook was lowered by the other winch into the hatch square by Harps. No one, apparently, observed or described the movements of the head of the boom under the effect of the appli-

cation of power to the winch immediately before the boom fell.

Before the stevedores came aboard at 8:00 o'clock that morning, the vessel's crew had hoisted the boom to a position with its head above and perpendicular to a point in the center line of the hatch square. There was also testimony that the stevedores were forbidden to change the angle of the boom with the deck, but that the stevedores changed the position of the head of the boom to a position above and perpendicular to a point two feet to port of the port hatch coaming, and about one-third of the length of that coaming forward of its after end. It also appeared (without contradiction) that libellant's fellow-employees changed the points of fastening of the port boom preventer and guy respectively—the preventer to a cleat on a stiffener in the rail of the vessel opposite a point approximately one-third of the distance forward from the after end of the hatch and one and one-half feet above the deck, and inboard from the rail, and the guy to a point on the rail approximately two-thirds forward of the after end of the port hatch coaming.

After the boom fell, the Captain of the vessel, its first officer, the seaman Gimm, Captain Jacobsen and Inspector Grundvig examined the position of the inshore timber with respect to the inshore edge of the under lip of the hatch coaming. They testified that they found the upper inboard edge of the timber for a short distance forward of its after end to have been in contact with and to have been dented by and stained with red paint from the inshore edge of the coaming lip. Numerous photographs were offered in behalf of libellant and respondent vessel respectively, and were marked in evidence. L-16 taken by libellant's attorney, for example, shows the sling around the two timbers, and a portion of the after end of the inshore timber well under and somewhat to the inshore side of the hatch square face of the starboard coaming. This position is more clearly and impressively shown in R-1, R-5, R-14, R-16, R-17, R-35, R-36

and especially in R-6. Despite testimony to the contrary given by libellant and his fellow-employees, I am persuaded by the clear weight of the evidence that either the taking of the slack or the taking of a strain by the port winchman on the sling which was around the two timbers caused the inshore timber to turn or roll (rather than to slide) toward the off-shore edge of the under lip of the starboard coaming, or otherwise to become jammed or drawn against the coaming edge, thus effectively blocking the further movement of the timber, and that the continued application of power to the winch imposed upon the topping-lift of the boom such an excessive strain as to cause it to break and the boom to fall.

The question immediately arises: Why did the power running to the winch fail to shut off automatically if and when an excessive load was built up as above concluded?

Assuming the respective dimensions and safe working loads of the respective components of the gear, the positions of the port boom and its preventer and guy, the direction of the cargo runner extending from the boom head to the sling around the two timbers (as disclosed by testimony offered in behalf of the vessel), and the obstruction by the lower edge of the starboard hatch coaming to the movement into the hatch square of the offshore timber, respondent's witness, Isaac Stewart, by the erection of triangles, the determination of angles and the application of the law of the parallelogram of forces, calculated that when the operator of the port winch took a strain in response to the gangwayman's signal to do so, a load or burden was suddenly applied to the topping-lift of the port boom amounting to 42,-300 pounds. On the other hand, the witness Robert A. Simons, testifying as an expert in behalf of the respondent-impleaded, calculated, upon similar factual assumptions, that the load imposed upon the topping-lift by the positions of the vangs when the power was applied to the winch as aforesaid, was 34,000

pounds. It is apparent, therefore, that the topping-lift parted under a strain of between 17 and 21 tons, or several times the safe working load of the topping-lift and other units comprising the unloading gear. It has been stipulated that the winch was provided with a device designed and set to shut off the current to the winch upon the application of a load of slightly in excess of six tons. After the topping-lift parted and the boom fell, an inspection of the winch indicated that the cut-off device had functioned, but the Court is unable to find in the evidence at what instant and under what strain the current was cut off. Harps, the winch operator, testified that he had applied less than full power to the winch when the topping-lift parted. The effect of the quantity of current flow upon the power developed by the motor is explained by the witness Simons, as follows:

"The greater the current applied to a motor, and therefore applied to the winch, the more horse power and torque the motor will have and, therefore, the more pull on the load or on the hoist wire. In other words, the greater the current that goes through that motor, the more power you are supplying to the motor, and the more power you are going to get out of that motor, and the more lift from the motor."

The witness added that "what ultimately shuts the current off is the resistance to that horse power of the motor * * * to be found in the load which is being hoisted." There was testimony, uncontradicted, that after the boom had fallen, Buss undertook to operate the winch, noticed that the cut-off device had functioned, threw a switch necessary to restore current flow, and then demonstrated that the winch operated perfectly. The cut-off device was susceptible of being so adjusted as to operate automatically at different degrees of excess load on the gear. In this case, apparently, the device was set to function at a much lighter load than was imposed upon the gear although it was set to op-

erate at a load slightly more than twice the safe working load of the topping-lift.

### The Liability of The Vessel

I conclude on the basis of the facts as found above that the setting of the winch cut-off device at the time the winch was turned over to libellant's fellow-employees for operation rendered the respondent vessel unseaworthy and therefore liable to libellant.

### The Proximate Cause of The Accident

Having found as a fact that the efforts of Nacirema to extract from beneath the deck the timber which lay or was drawn against the under-lip of the coaming, and that the positioning, by Nacirema employees, of the head of the boom and the preventer and guy created a load on the topping-lift greatly in excess of its safe working load, I cannot avoid the conclusion that the primary cause of the parting of the topping-lift and consequent fall of the boom which inflicted the bodily injuries upon the libellant is to be found in the impropriety and negligence of Nacirema in its handling of the gear and winch.

### The Vessel's Right To Indemnity

There was no contract between the owner of the vessel and Nacirema. On the contrary, one John Joseph Smith, President of Insular Navigation Company, steamship agents and brokers, testified on deposition taken by the respondent that Insular Navigation Company, acting in behalf of Ovido Compania Naviera S. A. Panama, executed a written contract with Nacirema for the unloading of the vessel at Port Newark, New Jersey. The vessel had been chartered by the owners to Ovido through Insular. Neither the charterer nor its agent is a party to this litigation.

Nevertheless, libellant and his fellow-employees of Nacirema were impliedly, if not expressly, invited to come and be aboard the vessel for the purpose of unloading her cargo and to use the vessel's tackle and gear in a manner appropriate for that purpose. Cf. Pope & Talbott, Inc., v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Freitas v. Pacific-Atlantic Steamship Co., 9 Cir., 218 F.2d 562. Entirely apart from its obligation under its contract with the agent for the charterer of the respondent vessel, Nacirema owed the vessel and her owners the duty of using due care in her unloading. Cornec v. Baltimore & Ohio R. Co., 4 Cir., 48 F.2d 497; Seaboard Stevedoring Corp. v. Sagadahoc S. S. Co., 9 Cir., 32 F.2d 886. See also, Rich v. United States, 2 Cir., 177 F.2d 688.

In the language of Judge Frank in Palazzolo v. Pan-Atlantic Steamship Corp., 2 Cir., 211 F.2d 277, 279, affirmed sub nom. Ryan Stevedoring Co., Inc., v. Pan-Atlantic Steamship Corp., by an equally divided Court, 349 U.S. 901, 75 S.Ct. 575, 99 L.Ed. 1239:

> "indemnity over is recoverable where, as here, the employer's negligence was the 'sole' 'active' or 'primary' cause of the accident. Nor does the absence of a formal contract bar indemnity." (Citing Rich v. United States, supra.)

The vessel in the case at bar does not seek contribution from the stevedoring contractor as a joint tort-feasor, as was the situation in Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318. The respondent vessel in the present case asserts, and I conclude as a matter of law that Nacirema's negligence was the sole, active or primary cause of the parting of the topping-lift and the fall of the boom, with its consequent injuries to the libellant, by reason of the negligent manner in which Nacirema through its employees, attempted to extract the timber from its obstructed position beneath the deck of the vessel. Nacirema may not have breached any contract with the vessel's owners, but, through its servants, it violated a duty which it owed to the vessel to exercise reasonable care in conducting its unloading operations. I find that it failed to exercise that degree of care and that, as a result thereof, it brought into play the unseaworthy condition of the vessel for which the

latter would be liable in damages to libellant under the principles enunciated in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; and Berti v. Compagnie De Navigation Cyprien Fabre, 2 Cir., 213 F.2d 397.

The question whether under these circumstances the vessel is entitled to indemnity from the stevedore contractor has recently been discussed by Judge Dawson in Allen v. States Marine Corporation of Delaware, D.C.S.D.N.Y.1955, 132 F.Supp. 146. In that action, a longshoreman sought to recover damages for personal injuries from the vessel. The vessel filed a third party complaint against the stevedoring firm employing the longshoreman, alleging that the stevedoring firm was the actual tortfeasor and that consequently the vessel was entitled to indemnity. The stevedoring firm moved to dismiss. Reviewing numerous decisions, Judge Dawson comments at page 148:

"Therefore, the question is whether the relationship of Allports Stevedoring Co., Inc. as the stevedoring company engaged in the unloading operations on their ship imported an implied agreement to indemnify the owner of the ship for any damages which he might have to pay as a result of injuries to employees of the stevedoring company. There was no contractual relation between States Marine Corporation of Delaware and Allports Stevedoring Co., Inc. so that if this liability to indemnify existed, it must be based upon the relationship and not based upon any separate contractual obligation.

"If there had been a contract relationship, the right of indemnity would exist because, as a matter to be implied from the contract, the owner of the ship is entitled to restitution for any damages which it has suffered due to the failure of the other contracting party to perform the duties necessarily comprehended

within the contract. Barber S.S. Lines v. Quinn Bros., D.C.Mass. 1952, 104 F.Supp. 78.

"But it does not seem that the right of indemnity is necessarily predicated upon the existence of a direct contractual relationship between the parties. See McFall v. Compagnie Maritime Belge, 1952, 304 N.Y. 314, at page 331, 107 N.E. 2d 463.

"If, as in this case, the shipowner has chartered the ship to another who in turn employs a stevedoring firm, that stevedoring firm may be held—depending upon the facts which develop at the trial—to have assumed an obligation not alone to the charterer of the ship, but also to the shipowner, to perform its work in such a way that no liability will be imposed upon the shipowner arising out of the active negligence of the company which is actually performing the longshore contract.

"It has been held, at least on motions to dismiss a complaint, that if a vessel owner has been found responsible to a seaman for breach of its non-delegable duty to provide a safe place to work, and that breach resulted from the active negligence of the impleaded defendant and not from any active negligence of the owner of the ship, the owner of the ship would have a right to indemnity. In such an event, an implied contract of indemnity would arise because of the relationship between the parties. Di Meglio v. The Black Condor, D.C.S.D.N.Y. 1954, 120 F.Supp. 865; see Valerio v. American President Lines, D.C. S.D.N.Y.1952, 112 F.Supp. 202."

I concur in the reasoning of Judge Dawson, believing that it sets forth the only reasonable, equitable answer to the question which he and the instant issue poses.

I therefore conclude that the vessel is entitled to indemnity from Nacirema for the damages to be awarded libellant as hereinafter stated.

## Injuries

Libellant testified that when the boom fell he was struck in the back and pinned to the surface of the cargo of timbers in the hatch. He was unable to determine what hit him, because he was knocked into a prone position upon the cargo and lapsed into unconsciousness after a period of a few moments. When he regained consciousness, a weight, which had been resting upon his lower back, was being lifted from him and he suffered great pain in his chest, right hip, both legs, back, right groin, both knees and left ankle.

After his removal from the hatch, libellant lay on deck for about three-quarters of an hour, and was then transferred to an ambulance, which transported him to St. James Hospital in Newark. There he underwent six or seven blood transfusions. A week after admission to the hospital he was placed in a plaster body cast, extending from chest to groin, and his left leg was also placed in a cast. He was later placed in traction, a steel pin having been passed through his right knee as a traction attachment. He remained in this position until about April 20, 1954. During this period he was under general sedation, and suffered from nightmares in which he seemed to be imaginatively dodging falling objects. He was discharged from the hospital on April 20, 1954, on crutches, using a brace for his back, which had been provided for him shortly before he left the hospital. He continued to receive treatments from Dr. Edwards (who had attended him while in the hospital), and these treatments continued until June 1, 1954, when he commenced receiving physiotherapy at Presbyterian Hospital in Newark, together with whirlpool treatments for his ankle, heat and massage treatments to his back and diathermy to his groin. These treatments, which were received thrice weekly, extended over a period from June 1 to December 10, 1954. At the conclusion of that period, he commenced to receive treatments at the hands of a nurse furnished by Travelers Insurance Company in Newark. These treatments continued to February 13, 1955, and consisted of heat and massage. In March of 1955, after further X-rays, libellant commenced undergoing treatments from Dr. Lohman, which consisted of diathermy to his back and electric shock. These continued until February 1956, shortly before the commencement of the trial of this case.

On April 2, 1955, libellant unsuccessfully attempted to earn some money by shining shoes, but after a week's trial, he discontinued his efforts because of intense pain. At the time of trial, libellant was still unable to stand long on his feet, was unable to walk more than a short distance, and still suffered pains in his back, legs, groin and stomach. He is unable to sit long, his pain is increased in inclement weather, and he requires the rigidity of a board beneath his mattress when attempting to sleep. This man still required the aid of a cane in walking, and, at the site of an adherent, permanent two-inch scar, which extends from the external malleolus of the left ankle down toward the heel, suffers severe pain and limitation of motion.

On X-ray, libellant was found to have suffered fractures of the transverse processes of the first, second and fourth lumbar vertebrae, on the right side, and of the transverse processes of the second and third lumbar vertebrae on the left side, with separation of the fragments. He also suffered a subluxation of the right sacro-iliac joint, and fractures of the superior and inferior rami of the right ischial bone, with marked overriding of the fragments. He further suffered a separation of the symphysis pubix, a comminuted fracture of the inferior ramus of the left pubic bone and a probable fracture of the superior ramus of the right ischial bone with the displacement of fragments. There were also revealed a comminuted fracture of the lower end of the left tibia, involving the medial malleolus and articular surface, as well as a comminuted fracture of the lower end of the left fibula which included the external malleolus. There was a widening of the ankle joint mortise, with slight forward subluxation of

the foot. There was also X-ray evidence of a transverse fracture of the proximal third of the shaft of the right fibula, without displacement of the fragments.

In addition to his numerous and permanently disabling orthopedic injuries, and by them induced, in the opinion of a competent neuropsychiatrist, libellant suffered shock and an anxiety reaction with a conversion hysteria.

I find that libellant suffered the foregoing numerous, severe and continuingly painful and permanently disabling injuries as a proximate result of the fall of the cargo boom hereinabove referred to.

### Damages

■ At the time he was injured on January 2, 1954, libellant, Crumady, was 42 years of age, and had been employed as a longshoreman for eight years previously. I find from the evidence that he suffers a degree of permanent disability which has prevented and will continue to prevent his resuming that occupation. His gross wages for 1953 were $4,070.45 (according to Internal Revenue Service Forms W-2 marked L-6 in evidence). Letter of May 8, 1956 to libellant's attorneys from James F. Hughes, Manager of the General Actuarial Division of The Prudential Insurance Company of America, marked exhibit L-46 in evidence, indicates that libellant at age 43 had an expectation of life of 25.03 years (based upon the United States Life Mortality table for non-white males, to which category libellant belongs). The Actuary further states in his letter that the "present value" of $1 per annum at 3% compound interest, is $15.9302, from which he computes, upon the assumption of weekly earnings of $70 less taxes, or annual earnings of $3,640, that it would require a capital fund of $57,985.93, invested at 3% compound interest, to produce $70 a week for such expectancy. I conclude that it is improbable that libellant would have continued to earn $70 a week throughout his life expectancy. At the time of the trial libellant required a cane to assist him in getting about and still suffered pain at certain injury sites in varying degrees of intensity at ir-

regular intervals. Despite the absence of specific evidence so indicating, my observation of libellant and consideration of the nature and degree of his permanent disability leads me to judicially notice the probability that he can still engage in some type of gainful occupation which does not involve heavy manual labor. Under all of the circumstances, therefore, I believe that a principal sum of $25,000 is a fair amount to award libellant on account of past and future losses of earnings.

Additional items of special damages are medical and hospital expense, as well as taxi fare for trips to and from hospitals as an outpatient, from June 1 to December 10, 1954 (thrice weekly at $2 per round trip). Libellant's care and treatment at St. James Hospital in Newark involved an expense of $2,411.25, and that at the Presbyterian Hospital in the same City (for outpatient treatments) totalled $590.90—a grand total for hospital expense and related transportation of $3,162.15.

In addition to these charges, libellant required treatment by Charles H. Edwards, M. D., at a cost of $1,005. Dr. Herman Lohman, M. D. who treated libellant from May 1955 until February 1956 at his office, rendered a bill in the amount of $510 (including X-rays necessarily taken by him), and this physician was of the opinion that the persistence of pain at the site of the comminuted fractures of the left tibia and fibula extending into the ankle joint could probably be terminated by a fusion at the ankle joint, which the Doctor estimated would require hospitalization of from three to three and one-half weeks and the wearing of a cast for from three to three and one-half months, physiotherapy and post-operative care. The Doctor's estimate of cost for this surgical intervention and attendant expense totalled $850. Thus I reach a total for medical expense of $2,365.

Libellant was still completely disabled at the termination of his treatment by Dr. Edwards, who was of the opinion that he would require considerable further treatment. This he received at the

hands of Dr. Lohman and in the form of physiotherapy as a hospital outpatient. Dr. Lohman found libellant completely disabled for heavy work at the time of the trial and that he had achieved maximum possible improvement except for the recommended fusion operation. For his pain, suffering, temporary and permanent disability I believe, therefore, that the libellant is entitled to the sum of $25,000.

I therefore award libellant $55,527.15 against claimant Joachim Hendrik Fisser, as owner of respondent vessel Joachim Hendrik Fisser, and award judgment in a like amount in favor of said claimant, Joachim Hendrik Fisser by way of indemnification and in exoneration of the liability of said vessel, against respondent-impleaded, Nacirema Operating Co. Inc.

The foregoing opinion shall constitute the Court's findings of fact and conclusions of law in this case, and an order for the judgments awarded hereby may be presented in accordance herewith.