**John H. CRUMADY, Appellant in No. 12138**

v.

**THE JOACHIM HENDRIK FISSER, Her Engines, Tackle, Apparel, etc., and Joachim Hendrik Fisser and/or Hendrik Fisser, Respondents (Nachirema Operating Co., Inc., Impleaded Respondent Appellant in No. 12140; Hendrik Fisser Aktien Gesselschaft, Claimant Appellant in No. 12139).**

**Nos. 12138–12140.**

United States Court of Appeals Third Circuit.

Argued June 13, 1957.

Decided Sept. 30, 1957.

Rehearing Denied Dec. 5, 1957.

Abraham E. Freedman, Philadelphia, Pa. (Sidney A. Brass, Newark, N. J., on the brief), for Crumady.

Victor S. Cichanowicz, New York City (Charles N. Fiddler, New York City, Frederick H. Cunningham, New York City, on the brief), for Hendrik Fisser Aktien Gesselschaft.

John J. Monigan, Jr., Newark, N. J., (Stryker, Tams & Horner, Newark, N. J., on the brief), for Nacirema Operating Co.

Before MARIS, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

Proceeding in rem against the ship Joachim Hendrik Fisser, the libellant Crumady has sued in admiralty to hold the ship and its owners responsible for personal injuries suffered by him while working on the ship as a stevedore employed by Nacirema Operating Co. in the unloading of the vessel at a berth in Port Newark, New Jersey. The respondent impleaded libellant's employer, Nacirema Operating Co., seeking thereby to obtain indemnification for any loss it might suffer through this suit.

After full hearing the court held the ship liable, ruling that one factor which contributed to the accident was the un-

seaworthiness of certain equipment of the ship. The court [142 F.Supp. 401] also allowed the ship to recover over against Nacirema, the party whose negligence, in the court's view, was the "sole, active or primary cause" of the accident.

Each of the parties has appealed. The ship challenges the ruling as to unseaworthiness. Nacirema claims that in any event there was no basis for holding it to indemnify the ship. The libellant complains that the amount of the award was erroneously determined and grossly inadequate.

We consider first the way the issue of unseaworthiness arose and was determined. The libel itself asserted a claim in admiralty for injury caused by the negligence of a ship and its owners, and nothing else.[1] There was no claim that unseaworthiness caused the accident or even that any unseaworthy condition existed. However, discussion at a pre-trial conference seems to have led the court to conclude that libellant's contentions included a claim predicated upon unseaworthiness. In any event, the transcript of the trial judge's statement at the conclusion of the pre-trial conference shows that he undertook to frame the issues, saying, apparently with the acquiescence of the parties, that the libellant "contends in effect that the injuries complained of resulted from the unseaworthiness of the vessel. * * *" In addition, the court made it clear that the structure alleged to have been unseaworthy was a cable or topping-lift which parted causing a boom which it supported to fall upon the libellant. Thereafter, libellant's proof was directed at establishing that the topping-lift was worn and defective and, for that reason, parted under the strain of lifting cargo which sound gear would have withstood.

The evidence relevant to this theory of liability was conflicting and the court,

with adequate basis in the record, found as a fact that the topping-lift was not defective but "was adequate and proper for the loads for which the rest of the gear was designed and intended". The court also found quite properly that Nacirema's employees, libellant's fellow stevedores, were negligent in their conduct of the unloading operation. More particularly, attempting to lift long and heavy timber from the hold they permitted the load to catch under the coaming at the margin of the hatch from which it was being removed. In addition, though forbidden to change the position of the head of the boom which the crew of the vessel had placed over the center of the hatch, they had changed the attachment of the preventer and guy which controlled the position of the boom so that the head of the boom was no longer over any part of the hatch but had been moved a distance to port of the hatch opening. The excessive and abnormal strain which this incorrect procedure imposed upon the topping-lift will be discussed later. It suffices to point out now that the court with justification attributed the accident primarily to this negligence of Nacirema.

But having thus eliminated the basis of unseaworthiness formulated at pretrial, the court found and adopted a new theory of the ship's unseaworthiness and responsibility which libellant had not pleaded and, so far as we can determine, had not attempted to establish in his proof. An understanding of the court's reasoning requires the consideration of additional circumstances not heretofore mentioned.

The gear being used at the time of the accident was rated and approved to lift a load of three tons or less. In the actual unloading operation a cable, called a cargo runner, was attached to the object to be lifted from the hold. This runner extended upward over a block at the end

1. Since Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, it has been authoritatively established, if not unanimously agreed, that admiralty affords an injured workman so situated as libellant two distinct causes against the ship, one for negligent injury and the other for injury caused by the unseaworthiness of the vessel, although, of course, there can be only one recovery of damages for the same personal injuries.

of a boom high above the hold and thence to and around a winch powered by an electric motor. The electrical equipment in this case included an automatic circuit breaker which stopped the flow of power to the winch whenever the current built up beyond the amperage for which the device had been set. Witnesses were asked to relate the cut off amperage to the strain imposed upon the winch by the load it was lifting. The witnesses agreed that the cut off was set so that if the motor should be required to overcome a strain on the cargo runner somewhat in excess of six tons the current would quickly build up to the setting of the circuit breaker and the motor would automatically cut off. In this case, the motor did cut off, apparently just before the topping-lift parted.

The libellant seems to have introduced testimony about the cut off device in an effort to show that the power was cut off before the gear was subjected to any greater strain than it should have been able to withstand. But in analyzing this testimony, much of which was a rather confused discussion of "load" and "torque" and other electrical concepts induced by questions addressed to the witnesses as though the concepts were mechanical rather than electrical, the court concluded that it was unsafe practice, rendering the gear unseaworthy, to have the cut off set so that the circuit would not be broken until the tension in the cargo runner should exceed six tons. In other words, the court thought the rating of the gear to handle a cargo load of three tons indicated that it was unsafe to have the circuit breaker so set that the cargo runner might be subjected to a six ton strain.

While the court's reasoning was in accord with an opinion expressed by a witness, the application of mathematics to the undisputed facts requires the rejection of that opinion and the acceptance of other testimony, based in part upon a Coast Guard standard for the setting of such a control, indicating that the setting of the cut off device was entirely safe and proper. The testimony was clear and undisputed that hoisting gear of the kind in suit is rated to lift a load not more than one-fifth of the strength of the cable itself. Thus, gear rated to handle a three ton load utilizes cable adequate to withstand a strain of fifteen tons. Such cable was used here. It is clear, therefore, that subjecting the cargo runner to a strain of six tons did not in itself create any undue risk of breakage. Indeed, as the testimony shows and the laws of physics teach, inertia, friction and the normal circumstances of operation make it necessary that substantially more than a three ton strain be imposed upon the gear before a three ton load can be lifted. Thus, the electrical equipment must and safely can impose a strain on the runner much greater than the weight to be lifted.

This was demonstrated by what happened in the present case. A strain of six tons or more on the cargo runner had no effect on that cable. The circuit breaker cut off the power at that point, while the strain was still well within the capacity of the cable. By the same token, if this operation had been conducted normally and properly the strain on the topping-lift would have been well within its capacity when the circuit breaker intervened. For this part of the gear also was rated to handle three tons of cargo and thus could withstand a fifteen ton strain.

The decisive fact, as the court found it, was that the employees of Nacirema had so changed the position of the head of the boom as to seriously distort the normal composition of forces which is presented by a straight lifting operation. It was for this reason that the topping-lift was subjected to an enormous, abnormal and unanticipated strain. On the basis of expert testimony the court found as a fact that this strain was somewhere between seventeen and twenty-one tons, three or four times the strain then being imposed on the cargo runner and the winch.

This analysis leads to two conclusions. It was a proper finding that the negligence of the stevedores was "the sole active or primary cause" of the parting

of the gear. But we think it is equally clear that the court erred in the next step of its reasoning, that this negligence of Nacirema "brought into play the unseaworthy condition of the vessel". The concept of seaworthiness contemplates no more than that a ship's gear shall be reasonably fit for its intended purpose.[2] Applied to the present facts, this means that the setting of the electrical circuit breaker could make the gear unseaworthy only if there was reason to fear that a strain of about six tons on the running gear, which would activate the cut off, would subject cable of fifteen ton capacity in the topping-lift to a dangerous strain. There is nothing in this record which suggests that such an eventuality was reasonably to be feared or anticipated. Thus, the gear was not proved to have been unseaworthy, neither was the setting of the cut off device established as a legal cause of the accident which occurred.

A decree should have been and now must be entered denying the libellant recovery. In these circumstances we do not reach the substantial question raised by the impleaded respondent whether there would have been legal basis for making it an indemnitor, had the ship's liability been sustained.

The judgment will be reversed.

### On Petition for Rehearing

Before BIGGS, Chief Judge, and MARIS, STALEY and HASTIE, Circuit Judges.

### PER CURIAM.

A petition for rehearing is presented for our consideration on a theory of unseaworthiness which seems not to have been advanced in the trial court and has not heretofore been urged on this appeal. We find no such merit in this or any other contention as would warrant a rehearing. Accordingly, the petition for rehearing is denied.

BIGGS, Chief Judge (dissenting).

My brother HASTIE's succinct opinion expressing the majority view as to why the accident to Crumady occurred raises an issue which requires rehearing before the court en banc. The majority opinion correctly concludes that Crumady was injured because a seaworthy boom, topping lift and tackle were employed to lift cargo from the vessel's hold but because the boom and topping lift were wrongly positioned by the stevedoring crew too great a strain was put on the boom and topping lift causing the topping lift to break.

Petterson v. Alaska S.S. Co., 9 Cir., 1953, 205 F.2d 478, affirmed per curiam, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L. Ed. 798, held that the responsibility of the ship owner was not shifted to the stevedoring crew because that crew brought on board and made use of a defective block which caused Petterson's injuries. The Court of Appeals for the Second Circuit in Grillea v. United States, 1956, 232 F.2d 919, held that where longshoremen placed a seaworthy, but wrong, hatch-cover over a "pad-eye", and thereafter a longshoreman stepped on the hatch-cover which gave way under him, causing him serious injuries, the ship was liable. In the case at bar, it would appear that a logical and necessary extension of the principles enunciated in Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, and in Petterson, would require the holding that the ship was liable for the wrongful positioning of the boom and the topping lift despite the fact that the stevedoring crew, of which Crumady was a member, placed the boom and the topping lift in position. This is a doctrine to the effect that a "seaworthy" round peg placed in a "seaworthy" square hole will render the whole unseaworthy. While it does not appear how long a time elapsed between the positioning of the boom and the topping lift and

2. The Silvia, 1898, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241; Doucette v. Vincent, 1 Cir., 1952, 194 F.2d 834; see Berti v. Compagnie de Navigation Cyprien Fabre, 2 Cir., 1954, 213 F.2d 397, 400. Cf. The Daisy, 9 Cir., 1922, 282 F. 261.

the occurrence of the accident in the case at bar, it is clear that some time necessarily elapsed.

For these reasons I conclude that rehearing should be had before the court en banc.