## CRUMADY *v.* THE JOACHIM HENDRIK FISSER ET AL.

No. 61.   Argued January 12–13, 1959.—Decided February 24, 1959.†

*Abraham E. Freedman* argued the cause and filed a brief for petitioner in No. 61.

*Victor S. Cichanowicz* argued the causes for petitioner in No. 62 and The Joachim Hendrik Fisser et al., respondents in No. 61.   With him on the briefs was *John H. Dougherty.*

---

†Together with No. 62, *The Joachim Hendrik Fisser* v. *Nacirema Operating Co., Inc.,* also on certiorari to the same Court.

*John J. Monigan, Jr.* argued the causes and filed a brief for the Nacirema Operating Co., Inc., respondent in both cases.

*Solicitor General Rankin, Assistant Attorney General Doub, Samuel D. Slade, Leavenworth Colby* and *Seymour Farber* filed a brief in No. 62 for the United States, as *amicus curiae.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner, Crumady, was an employee of a stevedoring company engaged in transferring a cargo of lumber from the ship *Joachim Hendrik Fisser* of German registry to a pier at Newark, New Jersey. While so engaged, he was injured and brought this admiralty suit by libel *in rem* against the vessel. The vessel impleaded the stevedoring contractor.

When the accident happened the stevedores were trying to lift two timbers through a hatch. The manner of the accident was described as follows by the District Court:

> ". . . libellant and his fellow-employees had placed a double-eyed wire rope sling, provided with a sliding hook movable between the eyes thereof, around the two timbers at a location two or three feet from their after ends. The two eyes of the sling were then placed upon the cargo hook of the up-and-down boom runner and a signal given by the stevedore gangway-man to the winchman to 'take up the slack.' The winchman complied with the signal, and during this operation libellant stood clear upon other timbers forming a part of the cargo, within the open square of the hatch. There was some testimony that when the slack was taken up by the winchman, the two timbers slid toward each other in the sling, the timber

which had been under the lower edge of the hatch coaming moving or commencing to move toward the timber which lay within the open hatch square. After the slack had been taken up by the winchman, the same signaller called for the 'taking of a strain' upon the cargo runner. The winchman again responded, the two-part topping-lift broke and the head of the up-and-down boom, with its attached cargo and topping-lift blocks, fell to the top of the cargo within the hatch square.

"The topping-lift had been rigged in a double purchase and had been supporting the head of the boom. The wire rope constituting the topping-lift extended from a shackle on the topping-lift block at the cross-tree of the mast, through a block at the boom head, back through the mast block, down the mast, through a block welded to the mast table, and thence around a drum of the winch. When the boom fell, libellant was knocked down, either by the boom itself or its appurtenant tackle, and thus sustained numerous serious and permanently disabling orthopedic and neurological injuries." 142 F. Supp. 389, 391.

The safe working load of the boom and cargo runner and topping-lift handling the load at the time of the accident was three tons each. This equipment, which was part of the unloading and loading gear of the vessel, was in good condition. The winch, which served the boom, had a "cut off" device or circuit breaker. It was set to shut off the current on the application of a load of about six tons, which was twice the safe working load of the unloading gear. The circuit breaker operated perfectly, cutting off current at the point of stress for which it was set. It had been set to operate at a load slightly more than twice

the safe working load of the unloading gear* by employees of the ship before the winch was turned over to petitioner's fellow employees for operation.

The District Court accordingly found the vessel unseaworthy and therefore liable to petitioner. It also found that the stevedores moved the head of the boom in an effort to clear the cargo from the sides of the hatch and that this "created a load on the topping-lift greatly in excess of its safe working load." This act was found to be "the primary cause of the parting of the topping-lift and consequent fall of the boom." Since the stevedoring company was found to be negligent in bringing "into play the unseaworthy condition of the vessel," the District Court directed the stevedoring company to indemnify the vessel for the damages to petitioner. 142 F. Supp. 389. The Court of Appeals reversed, holding that the vessel was not unseaworthy and that the sole cause of the injury was the negligence of the stevedores. 249 F. 2d 818. A petition for rehearing was denied *en banc,* Judge Biggs dissenting. 249 F. 2d 821. The cases are here on petitions for certiorari. 357 U. S. 903.

I. We held in *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85, 95, that stevedores, though intermediately employed, are, when performing "the ship's service," entitled to the same protection against unseaworthiness which members

---

*One expert, Robert A. Simons, testified:

"I said that it is not safe practice to have a rig that was designed for three tons working load and of the winch with a cut-off set at six tons so that you could apply six tons load to the hoist before the winch would cut off because that would be doubling the load for which the rig was designed for."

Another expert, Walter J. Byrne, testified:

". . . if you have three-ton gear and a three-ton winch and due to cut-offs in back, you allow, let us say, a hundred per cent overload to be developed, then I think from my point of view as a safety man you are taking away a governor. You are taking away something which is built in for the protection of the gear and personnel."

of the crew doing the same work would receive. And see *Pope & Talbot* v. *Hawn,* 346 U. S. 406. The work of loading and unloading is historically "the work of the ship's service." *Seas Shipping Co.* v. *Sieracki, supra,* at 96.

This protection against unseaworthiness imposes a duty which the owner of the vessel cannot delegate. *Seas Shipping Co.* v. *Sieracki, supra,* at 100. Unseaworthiness extends not only to the vessel but to the crew (*Boudoin* v. *Lykes Bros. Steamship Co.,* 348 U. S. 336) and to appliances that are appurtenant to the ship. *Mahnich* v. *Southern S. S. Co.,* 321 U. S. 96. And as to appliances the duty of the shipowner does not end with supplying them; he must keep them in order. *Id.,* at 104; *The Osceola,* 189 U. S. 158, 175. The shipowner is not relieved of these responsibilities by turning control of the loading or unloading of the ship over to a stevedoring company. It was held in *Grillea* v. *United States,* 232 F. 2d 919, that stevedores themselves could render a ship *pro tanto* unseaworthy and make the vessel owner liable for injuries to one of them. And see *Rogers* v. *United States Lines,* 347 U. S. 984; *Alaska S. S. Co.* v. *Petterson,* 347 U. S. 396. We need not go so far to sustain the District Court here. For there is ample evidence to support the finding that these stevedores did no more than bring into play the unseaworthy condition of the vessel. The winch—an appurtenance of the vessel—was not inherently defective as was the rope in the *Mahnich* case. But it was adjusted by those acting for the vessel owner in a way that made it unsafe and dangerous for the work at hand. While the rigging would take only three tons of stress, the cutoff of the winch—its safety device—was set at twice that limit. This was rigging that went with the vessel and was safe for use within known limits. Yet those limits were disregarded by the vessel owner when the winch was adjusted. The case is no different in principle from

loading or unloading cargo with cable or rope lacking the test strength for the weight of the freight to be moved. In that case the cable or rope, in this case the winch, makes the vessel *pro tanto* unseaworthy. That was the theory of the District Court; it correctly applied the concept of unseaworthiness; and its findings of fact were not clearly erroneous. *McAllister* v. *United States*, 348 U. S. 19, 20.

II. A majority of the Court ruled in *Ryan Co.* v. *Pan-Atlantic Corp.*, 350 U. S. 124, that where a shipowner and stevedoring company entered into a service agreement, the former was entitled to indemnification for all damages it sustained as a result of the stevedoring company's breach of its warranty of workmanlike service. And see *Weyerhaeuser S. S. Co.* v. *Nacirema Co.*, 355 U. S. 563. The facts here are different from those in the *Ryan* case, in that this vessel had been chartered by its owners to Ovido Compania Naviera S. A. Panama, which company entered into the service agreement with this stevedoring company. The contract, however, mentioned the name of the vessel on which the work was to be done and contained an agreement on the part of the stevedoring company "to faithfully furnish such stevedoring services."

We think this case is governed by the principle announced in the *Ryan* case. The warranty which a stevedore owes when he goes aboard a vessel to perform services is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not. That is enough to bring the vessel into the zone of modern law that recognizes rights in third-party beneficiaries. Restatement, Law of Contracts, § 133. Moreover, as we said in the *Ryan* case, "competency and safety of stowage are inescapable elements of the service undertaken." 350 U. S., at 133. They are part of the stevedore's "warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured

product." *Id.*, at 133–134. See *MacPherson* v. *Buick Motor Co.*, 217 N. Y. 382, 111 N. E. 1050.

We conclude that since the negligence of the stevedores, which brought the unseaworthiness of the vessel into play, amounted to a breach of the warranty of workmanlike service, the vessel may recover over.

The judgment of the Court of Appeals is reversed and the judgment of the District Court is reinstated.

*It is so ordered.*

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANKFURTER and MR. JUSTICE WHITTAKER join, dissenting.

It should be said at the outset that neither of these cases should have been taken for review. No. 61, although of course important to the unfortunate victim of this accident, satisfies none of the criteria for certiorari set forth generally in Rule 19. The case involves merely factual issues of consequence only in this particular litigation, and being in admiralty lacks even that feature, the right to jury trial, which some of my Brethren have found to justify the Court's reviewing the sufficiency of the evidence in FELA and Jones Act cases. No. 62, dependent as it is on No. 61, likewise does not belong here.

When this Court reverses a Court of Appeals, particularly on issues of fact, I think the lower court is at least due an understandable explication of the reasons. In No. 61 the Court holds the vessel liable on the ground that its setting of the circuit breaker to cut off at a strain of more than 3 tons rendered the lifting gear unseaworthy, and further finds that the stevedores "did no more than bring into play" this unseaworthy condition. The Court overturns the findings of a unanimous Court of Appeals that the setting of the circuit breaker at a strain of 6 tons did not make the lifting gear unseaworthy, and that the accident was caused not by this setting but by the steve-

dores' improper positioning of the head of the boom.*
249 F. 2d 818. In my opinion the action of the Court
lacks any solid basis. My views can best be pointed up
by briefly recounting what was held by the court below
in reversing the District Court.

The Court of Appeals first found that Crumady's claim
of unseaworthiness in the District Court was predicated
on the alleged defective condition of the topping-lift,
and not on the setting of the circuit breaker. *Id.*, at 819.
It then concluded that the District Court, "with ade-
quate basis in the record," had correctly rejected this
claim. *Ibid.*

The court then went on to hold that the District Court
had properly found the accident primarily attributable
to the negligent handling of the lifting operation by the
stevedores, in that they had permitted a long and heavy
timber to become wedged under the coaming of the hatch
from which it ,was being removed, as well as having
changed, contrary to instructions, the position of the head
of the boom. *Ibid.* This "incorrect procedure," the
Court of Appeals held, caused the topping-lift cable to be
subjected to "excessive and abnormal strain," which in
turn caused the cable to break and the boom to fall on
Crumady. *Id.*, at 819, 820–821.

Next, the Court of Appeals turned to the setting of the
circuit breaker, "a new theory of the ship's unseaworthi-
ness" which the court found had been "adopted" by the
trial court on its own initiative. *Id.*, at 819. In rejecting
this basis for holding the vessel liable the Court of Appeals
analyzed the situation as follows: (1) hoisting gear is
"rated" in terms of supporting a load of not more than

---

*Chief Judge Biggs, dissenting from the refusal of the Court of
Appeals to grant rehearing *en banc*, did not disagree with these
findings. 249 F. 2d, at 821.

one-fifth of the strength of the lifting cable; (2) the gear here involved was rated to lift 3 tons; (3) the cable it was intended to and did utilize, for both the topping-lift and cargo runner, was strong enough to withstand a strain of 15 tons; (4) the setting of the circuit breaker to cut off the power from the winch controlling the lifting operation at a strain of 6 tons was proper; (5) the circuit breaker functioned properly, but the stevedores' improper positioning of the boom subjected the topping-lift to "an enormous, abnormal and unanticipated" additional strain. *Id.*, at 820.

In light of its analysis of the record the Court of Appeals concluded (*id.*, at 820–821):

"It was a proper finding that the negligence of the stevedores was 'the sole active or primary cause' of the parting of the gear. But we think it is equally clear that the court erred in the next step of its reasoning, that this negligence of Nacirema 'brought into play the unseaworthy condition of the vessel.' The concept of seaworthiness contemplates no more than that a ship's gear shall be reasonably fit for its intended purpose. [Footnote omitted.] Applied to the present facts, this means that the setting of the electrical circuit breaker could make the gear unseaworthy only if there was reason to fear that a strain of about six tons on the running gear, which would activate the cut off, would subject cable of fifteen ton capacity in the topping-lift to a dangerous strain. There is nothing in this record which suggests that such an eventuality was reasonably to be feared or anticipated. Thus, the gear was not proved to have been unseaworthy, neither was the setting of the cut off device established as a legal cause of the accident which occurred."

What answer does this Court now make to the Court of Appeals' convincingly reasoned opinion? Simply the assertion that because the lifting gear was "rated" for only 3 tons, it was not clearly erroneous for the District Court to conclude that it was wrong to set the circuit breaker to cut off at 6 tons, "twice that limit." What support does the Court muster for this assertion? Nothing but a footnote reference to the testimony of two witnesses, without so much as a word about the Court of Appeals' rejection of the probative value of such testimony in the face of, among other things, "a Coast Guard standard for the setting of such a control, indicating that the setting [at 6 tons] of the cut off device was entirely safe and proper." *Id.,* at 820.

Perhaps I should add that I believe unavailing Chief Judge Biggs' suggestion on petition for rehearing that liability might be predicated on the stevedores' improper positioning of the head of the boom and the theory of unseaworthiness enunciated by Judge Learned Hand in *Grillea* v. *United States,* 232 F. 2d 919. 249 F. 2d, at 821. The record contains no indication that the positioning of the boom was other than "an incident in a continuous operation" beyond the compass of that theory. *Grillea* v. *United States, supra,* at 922.

In view of the foregoing I think the Court's action overriding the Court of Appeals entirely unjustified. I would affirm the judgment below in No. 61, and not reach, as the Court of Appeals found it unnecessary to do, the indemnity issue put to us in No. 62.

Since my views have not prevailed, however, I am bound to consider the indemnity issue in light of the Court's reasoning in the action for unseaworthiness. In this light I must again dissent. As I read *Ryan Stevedoring Co.* v. *Pan-Atlantic S. S. Corp.,* 350 U. S. 124, the ship is entitled to indemnity only if the liability-inducing unseaworthiness or hazardous working condition is created

by the stevedore. Here, on the Court's premises, Nacirema merely brought into play an unseaworthy condition created by the vessel itself. And on the Court's further premise that this condition was the cause of the injuries sustained by Crumady I think neither the decision nor the underlying principles in *Ryan* justifies the award of indemnity. Cf. *Weyerhaeuser S. S. Co.* v. *Nacirema Operating Co.,* 355 U. S. 563, 568.