Matthew M. Levy, J.
This case neatly illustrates the coexistence in American jurisprudence of dissimilar legal principles — Federal and State, maritime and common — and the recognized constitutional ascendancy, in this sphere, of the decisions of the Supreme Court of the United States (U. S. Const., art. 111, § 2).*
The plaintiff seeks in this action to recover damages for personal injuries. The cause was tried before me without a jury. The relevant facts are found to be as follows :
On June 21, 1951, the plaintiff was a longshoreman employed by John W. McGrath Corp. The defendant Israel America Line, Inc., owned and operated a steamship known as the Tel Aviv. The defendant Merritt-Chapman & Scott Corporation owned and operated a lighter, sometimes called a barge or derrick, known as the Charleston. The stevedore McGrath was engaged to load certain cargo on the 8. 8. Tel Aviv, as was the stevedore Merritt-Chapman. The Tel Aviv was lying in the navigable waters of New York Harbor, moored and tied to the dock at Pier 37, Hudson River. The Charleston was moored alongside and tied to the Tel Aviv.
It has been the custom and practice in the Port of New York, when loading is to be done from a barge alongside a vessel, that a Jacob’s ladder— an essential part of the vessel’s equipment and furnished by the vessel — be put over the side of the vessel by its harbor master and crew immediately after the lighter is made fast, so as to provide access to and from the respective craft. The harbor master of the defendant Israel America Line caused ropes to be attached from the lighter to the ship, but did not put down a Jacob’s ladder.
For a while, the plaintiff and his coworkers were placing dunnage on the deck of the steamship in preparation for the oncoming cargo. When the shifting of the dunnage was finished, the longshoremen were directed by their superior (not an agent or employee of the Israel America Line) to go aboard the lighter. From the deck of the Tel Aviv to the deck of the Charleston was a distance of about five feet or so. The men looked for the Jacob’s ladder and found none; they looked for an officer or a member of the vessel’s crew, but there was none *595 to be seen. No other means of access to the lighter was furnished or available. The longshoremen were told by their hatch boss to jump to the lighter. The three or four longshoremen who were the plaintiff’s coworkers were younger men. They promptly jumped, one by one, and landed safely and well. Although fearful of the results and in consequence hesitant, the plaintiff — 61 years of age, and but recently returned to the arduous labors of longshore work after some years spent in conducting a retail grocery store ■ — jumped too. The result was that the plaintiff suffered personal injuries (to be described hereinafter).
The suit was grounded in negligence in respect of both defendants. At the trial, the action was discontinued as to the defendant Merritt-Chapman, and a count of unseaworthiness was added as against the defendant Israel America Line (Gabaree v. Jay Ship Maintenance Corp., 166 F. Supp. 625).
The accident having occurred in navigable waters, the law of this State is inapplicable and the national maritime law governs (Garrett v. Moore-McCormack Co., 317 U. S. 239, 243-245; Panama R. R. Co. v. Johnson, 264 U. S. 375, 386; Riley v. Agwilines, Inc., 296 N. Y. 402, 405-406). And in the circumstances of this case, the plaintiff, a harbor worker, is entitled to the benefits of the favorable doctrines of the law of the sea (Crumady v. The Joachim Hendrik Fisser, 358 U. S. 423). One of these principles, now well established, is that a ‘ ‘ vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen [and by longshoremen, Pope & Talbot v. Hawn, 346 U. S. 406] in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship ” (The Osceola, 189 U. S. 158,175; see, also, Mahnich v. Southern S. S. Co., 321 U. S. 96; Mitchell v. Trawler Racer, 362 U. S. 539). The doctrine, said the Supreme Court of the United States, ‘ ‘ is essentially a species of liability without fault, analogous to other well known instances in our law. Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor contractual in character ”. The nature of the shipowner’s obligation in that respect “ is a form of absolute duty owing to all within the range of its humanitarian policy ”. (Seas Shipping Co. v. Sieracki, 328 U. S. 85, 94, 95.)
I hold that, in the circumstances proved upon the trial, the failure of the shipowner to supply and have affixed a Jacob’s ladder as a means of passage to and from the lighter tied to it rendered the vessel unseaworthy. That there may have been *596 such a piece of equipment locked up, somewhere on the vessel, does not suffice, in my opinion, to warrant a contrary holding. As strikingly put by Chief Judge Biggs, “ a ‘ seaworthy ’ round peg placed in a ‘ seaworthy ’ square hole will render the whole unseaworthy ” (dissent in Crumady v. The Joachim Hendrik Fisser, 249 F. 2d 818, 821, revd. 358 U. S. 423, supra).
The defendant leans quite heavily upon Judge 'Wbini’bld’s holding in Guiliano v. United States (117 F. Supp. 610). But I find that case to be inapplicable. As the learned court points out, there was in fact a Jacob’s ladder available, in place, accessible and in use, and, indeed, after trial, the claim of alleged unseaworthiness was conceded by counsel for Guiliano himself to have failed.
Jackson v. Pittsburgh S. S. Co. (131 F. 2d 668) is also relied upon by the defendant. This decision was rendered nearly two decades ago. Whether it correctly expresses the law today on the question of 1 ‘ unseaworthiness ’ ’ is doubtful. If, as contended by the defendant, the Jackson case is an authoritative precedent on the subject, it is curious that “ unseaworthiness ” — a word of art in this field of the law — is absent from the opinion. The suit was by a seaman under the Jones Act (U. S. Code, tit. 46, § 688) to recover damages for personal injuries from the owner of the vessel for the alleged negligence of the owner, and under the general maritime law for cure and maintenance. The steamship involved was tied to the dock in the harbor at Toledo, Ohio. Jackson, the seaman, was a member of the crew. He desired to go ashore after coming off watch; he went to the forward part of the main deck to descend a ladder to the dock; none was available; he requested an unidentified fellow crewman to place a ladder there and his request was refused; he thereupon jumped from the deck to the dock, a distance of about six feet, with the result that he sustained injuries. The court held that, assuming that there was a breach of duty and therefore negligence on the part of the owner in failing to provide a ladder at the time and place involved, such negligence did not bear any causal relation to the injuries which followed. The court said (p. 670) that “ the obligation of the vessel or its owners * * * does not extend * * * to injuries received by a seaman while engaged in his personal affairs. * * * When a seaman, by his own volition, creates an extraneous circumstance, he brings about an intervening cause that directly affects his relation to his employers and to the ship. He is responsible for such intervening cause if it consists of his own wilful misconduct, is something which is done in pursuance of some private avocation or business, or grows out of relations *597 unconnected with the service or is not the logical incident of duty in the service. * * * The plaintiff was not compelled to jump from the ship. The only expectable injury that he might have suffered from the failure to provide a ladder, would have been some inconvenience or delay in leaving the vessel. This could readily have been avoided or minimized either by putting the ladder in place himself or in requesting some one in authority to direct that it be done.”
The present is not the case of a ladder being had for the searching or of a ship’s officer being available for the asking. Nor is it that of a seaman jumping ashore to go off on a frolic of his own. The defendant seeks to make much of the contention that when the laying of the dunnage had been completed, the plaintiff’s work on the Tel Aviv had ended for the time being, that the Charleston was moored alongside the defendant’s ship for the heavy derrick labors to be performed by workers other than the plaintiff and his coemployees of McGrath, that mealtime was soon at hand, that the McGrath longshoremen, including the plaintiff, were not to undertake the loading of the vessel in the performance of what they had been engaged to do until a short while later that day, that they were not normally to assist in the performance of the Merritt-Chapman separate assignment, and that therefore they need not and should not have gone to the barge.
As I study the facts in the case at bar in the light of the pattern and the trend of the recent pronouncements of the United States Supreme Court, the defendant is seeking here to draw too fine a line between what may be deemed the permissible and the impermissible conduct of a maritime worker as an inexorable determinant as to the liability for a vessel’s unseaworthy condition. True enough, as urged by the defendant, it was not its employees but McGrath’s foreman, the plaintiff’s superior on the job, who gave the longshoremen instructions to go down to the lighter from the ship. That does not, in my view, eradicate the defendant’s culpability in failing to have an appropriate means of egress from its ship to the lighter tied fast to it.
The Supreme Court of the United States has imposed a high standard of care on shipowners in respect of their duties to seamen, longshoremen, and the like. I shall cite a few decisions showing the court’s direction. Conditions causing unseaworthiness may be permanent or transitory (Alaska S. S. Co. v. Petterson, 347 U. S. 396). “ [T]he shipowner’s actual or constructive knowledge of the unseaworthy condition is not essential to his liability * * * What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence.” *598 (Stewart, J., for the majority in Mitchell v. Trawler Racer, 362 U. S. 539, 549-550, supra). In Alaska S. S. Co. v. Petterson (supra) the court held the owner of a vessel responsible in damages to a stevedore employee injured by unsafe gear temporarily brought aboard the vessel by the stevedoring company. In Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp. (350 U. S. 124) the court held that improper loading of a vessel — even though the loading was done by others ■ — • created an unseaworthy condition for which the owner was liable. Mitchell v. Trawler Racer (362 U. S. 539, supra) appears to be the latest decision of the court on the subject. The facts, as summarized in the opinion, follow: The petitioner was a member of the crew of the Boston fishing trawler Racer, owned and operated by the respondent. The vessel had returned to her home port from a 10-day voyage to the North Atlantic fishing grounds, loaded with a catch of fish and fish spawn. The proceeds from the sale of the spawn were to be divided among the members of the crew, no part thereof going to the officers or to the owner of the vessel. After working with his fellow crew members in unloading the spawn on the morning of arrival, the petitioner changed his clothes and came on deck to go ashore. He made his way to the side of the vessel which abutted the dock, and in accord with recognized custom stepped onto the ship’s rail in order to reach a ladder attached to the pier. He was injured when his foot slipped off the rail as he grasped the ladder. The ship’s rail, where the petitioner had lost his footing, was covered for a distance of 10 or 12 feet with slime and fish gurry, apparently having remained there from the earlier unloading operations. The court held that, on account of this unseaworthy condition, the ship owner was liable for the petitioner’s injuries.
As I have said, I hold that the defendant in the case at bar is liable to the plaintiff because of the ship’s unseaworthiness in not having a usable Jacob’s ladder in place, in accordance with the custom of the port, as a means of egress from the vessel to the barge tied up to it. The defendant’s motions to dismiss the complaint are therefore denied. Nevertheless, I recognize that there is merit to the defendant’s contention that the plaintiff knew or should have known that he was doing a dangerous thing in jumping, and that he is therefore contributorily responsible for so doing, even though the average longshoreman would have taken — and did take — the risk. This was recently pointed up by Judge Learned Hand, when, speaking for the Court of Appeals in the Second Circuit, he said: “ It appears to us that, however likely it may be that the ordinary longshoreman would *599 have taken the risk of walking on the oil spot, to do so involved an obvious hazard and was an impermissible imprudence.” (Santomarco v. United States, 277 F. 2d 255, 257.) In the case at bar, the plaintiff should undoubtedly have been more careful. But, in respect of the present suit — unlike an action under the common law — his damages, while not altogether uncompensable, should be reduced by virtue of that lack of care.
The rule is correctly stated in Norris, The Law of Maritime Personal Injuries (§ 42, pp. 105-106), as follows: “When seamen’s suits for negligence under the Jones Act or for unseaworthiness are tried in the State courts the rule of proportionate fault of comparative negligence must apply, rather than the common-law rule of complete bar for contributory negligence. It follows that the suits of harbor workers for maritime torts, not resulting in death, on navigable waters when brought in State courts must have the maritime rule of comparative negligence applied.”
This brings me to the question of damages. The plaintiff was born on April 8, 1890. At the time that the accident occurred, June 21, 1951, the plaintiff had passed his 61st birthday. He was in normal good health. On the day following the accident, he was taken to the Beekman-Downtown Hospital where he remained for a period of six days. He returned to the hospital from time to time for further out-patient treatment, this — according to the plaintiff — having continued for a period of some 40 or 42 weeks. Thereafter he was examined and treated by his personal doctor, whom he has seen on several occasions. X rays, which were taken at the Beekman-Downtown Hospital, revealed a fracture of the right os colds at the junction of the middle and posterior third. There was impaction of fragments with resultant flattening of the midtarsal arch. In addition, of course, there were the concomitant pain and shock. A plaster boot was applied to his right foot. The final diagnosis as contained in the hospital report was that there was a “ closed fracture right os caléis ”. Orthopedic shoes were recommended to the plaintiff; he wore them and still does. The plaintiff asserted at the trial that he continued to have some difficulty walking and still has some discomfort in his right leg and ankle. He testified that he has not worked since the accident.
The evidence with respect to the earnings of the plaintiff prior to the accident was rather sketchily presented by the plaintiff and left much to be desired. Immediately prior to the accident the plaintiff was employed by McG-rath and perhaps other stevedore and longshoremen firms, among them the Jarka Corporation. The" plaintiff testified that he used to earn at times $30 a *600 day, at other times $40 a day, depending on the nature of the work and whether it was piece work or not; he stated that he did not earn less than $70 during a week and at times as high as $80 if he worked overtime, but that on an average he earned $70 a week. However, in answer to an inquiry by the court as to what was the highest pay that he received for a week from McGrath, the plaintiff answered that sometimes he would get $50, sometimes $60, sometimes $40 — in each instance depending upon how much work he did. He testified that he started to work as a longshoreman in March of 1951 and continued until June 21 of that year when he was injured — in other words, for a period of something over three months during 1951. The defendant offered in evidence proof that the plaintiff’s total earnings from October 1, 1950 to September 30, 1951 as a longshoreman aggregated $497.82. In view of the plaintiff’s testimony that he had not started this type of work until March of 1951 and that it ended with the accident, it would appear that, during this three-months-plus period, his average weekly earnings were no more than $40. It may be that, because of the unsteady nature of his work prior to the accident, many days went by during this time when the plaintiff was not actually working and had no earnings as a longshoreman.
I take judicial notice of the life expectancy tables. When the accident occurred, nine years ago, the plaintiff was 61 years of age. Accordingly, the plaintiff now has a statistical life expectancy of approximately 9 to 11 years (Commissioners 1941 Standard Ordinary Mortality Table; United States Life Table for the Total Population: United States, 1949-1951 and Life Table for Total Males, United States, 1949-1951). Of course, I am mindful that life expectancy as shown by mortality tables indicates only the average length of life among the many persons whose lives are taken into account in preparing the tables. And so I should take into consideration also what proof there was as to the plaintiff’s health, constitution, habits and manner of living. Taking all factors into account, it is quite clear to me that, had there been no accident, the plaintiff could not have continued doing the strenuous work of a longshoreman up to the age of 79 or 81 years.
So much for earnings and likely loss of them. And so much for continued pain and discomfort arising from the injuries sustained. As to expenses, the plaintiff’s hospital bill was $137.93 and his medical disbursements were $607.60. The orthopedic shoes and supplies aggregated some $50.
It would seem to me that, if the plaintiff had been entirely free from contributory negligence, an award in his favor of *601 $14,795 would be appropriate. However, I find that his negligence contributed to the accident — in that his conduct was not that of a reasonably prudent man — to the extent of 35%. The award must be reduced by this percentage, and so I award the plaintiff damages in the sum of $9,616.75.
The defendant is granted 30 days’ stay and 60 days to make a case.
The foregoing constitutes my decision in compliance with the New York Civil Practice Act.

 One critic, quite picturesquely, characterizes the mixture of federalism and the admiralty as “The Devil’s Own Mess” (Currie, Supreme Ct. Rev., Law School of Univ. of Chicago, p. 158 [1960]).