**William TRAVIS**

v.

**INTERNATIONAL MULTIFOODS CORP.**

v.

**GREAT LAKES ASSOCIATES, INC.**

Civ. A. No. 74–543.

United States District Court, W. D. New York.

Dec. 11, 1978.

Fenton Harrison, Harrison & Gruber, Buffalo, N. Y., for plaintiff.

James D. Gauthier, Hurwitz, Siegel & Hurwitz, Buffalo, N. Y., for defendant/third-party plaintiff International Multifoods Corp.

Evan E. James, Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., for third-party defendant, Great Lakes Associates.

MEMORANDUM OF DECISION

HOLDEN, District Judge.*

The plaintiff William Travis, a longshoreman, was injured on June 7, 1974 in the

* Chief Judge of the United States District Court for the District of Vermont, sitting by designation.

course of employment by Great Lakes Associates, Inc. (Great Lakes), a stevedoring company, while unloading grain from the vessel James E. Ferris in the Port of Buffalo. The consignee of the grain was International Multifoods Corp. (International). International rented to the ship all the mechanized unloading equipment, scoops and rigging required to unload the several holds of the ship into the consignee's elevators. International paid the charges for transporting the grain and is compensated for the use of its machinery and operating personnel at the rate of $5.00 per thousand bushels of grain unloaded. The operator of the mechanized equipment and deck hands were employees of International.

Great Lakes was engaged by the ship to scoop the grain into mechanical unloading equipment consisting of rotating buckets of the conveyor, referred to as the "leg," which was operated by International personnel.[1] The plaintiff sustained personal injuries when a common machine bolt, supplied by International as a part of the rigging, gave way under the stress of moving the back scoop toward the conveyor or buckets. The fault in the bolt unleashed the heavy steel chain, called a clevis chain, that was linked to a cleat on a wall of the hold.

Great Lakes was insured for its liabilities to its employees under the Longshoremen's and Harbor Workers' Compensation Act (the Act) by the State Insurance Fund. This insurance carrier paid full medical and compensation benefits to the plaintiff. Thereafter the plaintiff commenced this action, seeking $25,000 against International, alleging negligence and breach of warranty of the safety and sufficiency of the machinery and equipment furnished for the discharge of the grain cargo. International, in turn, filed the third party claim, now in suit, seeking full indemnity from Great Lakes.

International settled the main action before trial by the payment of $10,352.57. The evidence presented in the trial of the

third party action is undisputed that the compromise achieved by Travis' experienced trial counsel was reasonable from the standpoint of both parties to the principal action. The case proceeded to trial on the third party claim of International against Great Lakes for indemnification of the cost of settlement, including attorney's fees incurred in the compromise of the longshoreman Travis' claim against the non-employer stevedore.

At the close of the third party plaintiff's evidence, Great Lakes moved for a directed verdict and dismissal of the third party complaint asserted by International. Great Lakes offered no evidence except for an engineering report which was addressed to the issue of the fairness and reasonableness of the settlement made by International on the employee's claim in the main action. The court ruled from the bench that there were no issues of fact to be determined by the jury and that a written memorandum of decision would be filed which would include a direction to the clerk to enter judgment for the third party defendant on International's claim for contribution and indemnity against Great Lakes.

The facts, presented in the light most favorable to International's claim, establish that on June 7, 1974, William Travis was dispatched by the union gang boss, with several fellow employees of Great Lakes, to unload the grain consigned to International, which was transported from Duluth to the Port of Buffalo on the James E. Ferris. Upon arrival in port, International spotted the ship at one of International's elevators. The ship was docked by direction of the International's unloading crew. International operating personnel consisted of the elevator superintendent; he controls the conveyor from a mobile tower. A deck man was stationed aboard the vessel with observation of both the tower and the hold. He served as the "eyes of the tower" and communicated messages from the longshoremen in the hold to the tower concerning the unloading operations. International also

---

1. Great Lakes had no agreement with International. Its contract was with the ship by way of agreements negotiated annually with the ship's agent.

had an assistant superintendent on duty during the unloading. When the hold was opened, the tower operator lowered the leg into the hold by winches, on signal from the deck man. When the leg was first lowered into the hold the buckets on the conveyor were filled by gravity. When the force of gravity of the grain cargo was spent, the second phase of the stevedoring operation was undertaken by the scoopers employed by Great Lakes.

The longshoremen removed the rigging for the scooping operation from the tower where it had been hung and stored after the equipment was inspected by International on May 23, 1974, when it was last used. Great Lakes' employees rely on International personnel to inspect and ready the equipment for its use in the scooping operation and this was understood by the employees of both companies.

When the remaining cargo in the hold was ready to be scooped by Great Lakes, International's equipment and rigging was removed from its storage in the tower of the leg and turned over to Great Lakes for immediate use by the latter's longshoremen in scooping the grain remaining in the hold. The equipment and rigging included two scoops made of magnesium, approximately 4½ feet square with a heel 3 feet high. A rope or line of polyester dacron material was attached to the back scoop and extended through a quarter block, or pulley with a J-hook. A heavy clevis chain, inserted in the J-hook, was fastened through the end links to a cleat on the back of the ship's hold by a ¾″ common machine bolt, 5 inches in length. The linkage was completed by a nut affixed to the threaded end of the lynch bolt. The rope through the quarter block extended to the friction drum in the tower. The tower operator adjusts the friction. The movement of the shovel scoops is controlled by the scooper in the hold by means of a rope attached to a clutch which governs the movement of the frictions.

The lines and equipment for the back scoop, which Travis was operating on June 7, 1974, were rigged by Stanley Bruckman, who was operating the front scoop as a brakeman in the hold alongside Travis. It was Bruckman who made the actual connection of the clevis chain to the hold by means of the bolt. Travis' only part in the rigging operation was to lower the gear from the deck into the hold. As soon as the rigging was completed, the scooping operation was commenced with Bruckman braking the front shovel; Travis was working as brakeman for the back shovel. After a couple of pulls on the back shovel were made, the bolt, which linked the clevis chain to the ship, suddenly fractured at its threaded section, just below the shank. The clevis chain was flung against Travis, knocking him unconscious and inflicting the personal injuries which are the subject of this litigation. The parts of the fragmented bolt which were received in evidence (Pltf. Ex. 2 and 3) indicate the bolt was flawed in the lower threaded section, between the nut and the shank.

Evidence given by Stanley Bruckman was to the effect that he was not sure whether he inspected the equipment supplied by International before it was rigged; that the equipment was supposed to be inspected by International before it was received by Great Lakes' longshoremen. Apparently the flaw in the bolt was not detected by either International or Great Lakes, for it was the practice of the personnel of both stevedores to discard all defective bolts as soon as any defect was discovered.

## THE LAW

Upon consideration of the total evidence presented in the trial of the third party action, the court was persuaded that there was no issue of fact for determination by the jury. Great Lakes is not liable to International as a matter of law; International's third party complaint must be dismissed.

The sum and substance of this third party action is an effort by a negligent wrong-doer to recover the cost of its settlement with the victim from the injured longshoremen's employer. Indemnification of the ship by the employer stevedore was permissible prior to 1972, *e. g., Ryan Stevedoring*

*Co., Inc. v. Pan-Atlantic Steamship Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). The legal basis for the recovery was founded on the breach of stevedore's warranty of workmanlike performance owing to the ship. *Id.* at 134, 76 S.Ct. 232. Even under the *Ryan* doctrine, the stevedore's warranty to the ship did not prevail between co-stevedores. *Hartnett v. Reiss Steamship Co.,* 421 F.2d 1011, 1017 (2d Cir.) *cert. denied,* 400 U.S. 852, 91 S.Ct. 49, 27 L.Ed.2d 90 (1970). *See Zapico v. Bucyrus-Erie Co.,* 579 F.2d 714, 721 (2d Cir. 1978). The legislative history makes clear that in 1972 the Congress became acutely aware that the stevedore's warranty to the ship was causing an increase in third party litigation. This overburdened the employer's resources and tended to render inadequate the compensation benefits afforded longshoremen and other harbor workers by the Act.

> The Committee heard testimony that the number of third-party actions brought under the *Sieracki [Seas Shipping Co. v. Sieracki,* 328 U.S. 25, 66 S.Ct. 872, 90 L.Ed. 1099] and *Ryan* line of decisions has increased substantially in recent years and that much of the financial resources which could better be utilized to pay improved compensation benefits were now being spent to defray litigation costs. Industry witnesses testified that despite the fact that since 1961 injury frequency rates have decreased in the industry, and maximum benefits payable under the Act have remained constant, the cost of compensation insurance for longshoremen has increased substantially because of the increased number of third party cases and legal expenses and higher recoveries in such cases.

H.Rep. No. 92–1441, 92d Cong., 2d Sess. in 3 U.S.Code Cong. & Admin.News, pp. 4698, 4702 (1972).

To achieve that purpose, the Act was amended to provide:

§ 905. Exclusiveness of liability

(a) The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, or that the employee assumed the risk of his employment, or that the injury was due to the contributory negligence of the employee.

(b) In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter. As amended Oct. 27,

1972, Pub.L. 92–576, § 18(a), 86 Stat. 1263.

If both International and Great Lakes were negligent in the course of Travis' injury, there is no right of contribution among joint tort feasors in non-collision maritime actions. *Halcyon Lines v. Haenn Ship Corp.*, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952). And as Judge Friendly pointed out in *Zapico, supra* —

> (T)his Circuit has long viewed § 905(a) (and the old § 905) as preventing a third party claim for contribution from the employing stevedore, . . . . (citations omitted).

579 F.2d at 719.

The court in *Zapico* did not lock the door against all third party actions against the employing stevedore under § 905(b)

> . . . for example, although we do not intend these to be exclusive, where there is a direct contractual relationship between the third party and the stevedore or where the third party is designated as a beneficiary of an express contract between the stevedore and a vessel.

*Id.* at 722.

Here the evidence is unequivocal and undisputed that there is no express contract to indemnify International either between Great Lakes and the ship or directly between the co-stevedores themselves. Despite this shortage, International urges that a non-contracting party may be a third party beneficiary to the stevedore's warranties to the ship in the same fashion that such warranties prevailed prior to the 1972 amendment to the Longshoremen's and Harbor Workers' Compensation Act.

In this contention International places much reliance on *DeGioia v. United States Lines*, 304 F.2d 421, 424 (2d Cir. 1962). There the court held that the stevedore under contract with the United States Army to unload a ship at a Brooklyn army base was liable to indemnify the owner of the ship on the latter's liability to the stevedore's employee on its non-delegable duty to provide a seaworthy ship.

The opinion by Judge Clark in *DeGioia* goes on to explain:

The basis of the stevedore's obligation is its implied warranty of workmanlike service. The obligations which arise from warranty are not limited to the confines of an action on the contract; the zone of responsibility may extend beyond those in direct contractual relationship. (citations omitted).

\* \* \* \* \* \*

This is the meaning, as we see it, of *Waterman S.S. Corp v. Dugan & McNamara, Inc.*, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 . . . .

304 F.2d at 425.

It seems clear from the reference to *Waterman S.S. Corp. v. Dugan & McNamara, supra*, that the zone of responsibility refers to those injured who have a right to recover under the doctrine of liability without fault on the theory of warranty without need of privity. On the strength of this concept, the shipowner in *Waterman* was held to be the beneficiary of stevedore's warranty of workmanlike performance to the consignee who engaged the stevedore to unload the ship. 364 U.S. at 424, 81 S.Ct. 200. *DeGioia* is to the same effect wherein the ship was entitled to indemnity on the strength of the stevedore's warranty of performance to the United States Army who engaged the stevedore's services.

In the case at hand International seeks indemnity from its co-stevedore Great Lakes as a third party beneficiary of the latter's implied warranty of workmanlike performance owed to the vessel. The stevedore's warranty of performance of its services is plainly for the benefit of the vessel. *Crumady v. The J. H. Fisser*, 358 U.S. 423, 428, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). *See Zapico, supra*, 579 F.2d at 722. The concept that the warranty to the ship extended to a co-stevedore as a third party beneficiary was plainly rejected in *Hartnett v. Reiss Steamship Co., supra*, 421 F.2d at 1017 (2d Cir. 1970).

The clear language of the 1972 amendment removes Great Lakes as the stevedore-employer from liability to the vessel

" . . . directly or indirectly and any agreements or warranties to the contrary shall be void." 33 U.S.C. § 905(b).[2] International's claim to be a third party beneficiary to the stevedore's obligation to the ship invokes a warranty that has been vitiated by the Congress.

. . . (T)hird parties cannot claim to be third-party beneficiaries of a contractual warranty of workmanlike performance running to the vessel since subsequent to the Amendments it is perfectly clear no such underlying warranty exists. At best, they are third-party beneficiaries to a nullity.

*S.S. Seatrain Louisiana, etc. v. California Stevedore and Ballast Co., et al.,* 424 F.Supp. 180, 183 (N.D.Cal.1976).

 Since there is no direct contractual relationship between International and Great Lakes and no express agreement between the James E. Ferris and Great Lakes designating International as the third party beneficiary, International's claim for indemnification can not be sustained. *Cf. Zapico, supra,* 579 F.2d at 721–722 (noting the court's reluctance to cut off the availability of *Ryan* type indemnity in all cases, and citing two possible exceptions—where there is an express contract for indemnification between a non-vessel and a stevedore, and where there is explicit designation of a third party as a beneficiary of a contract between a vessel and a stevedore); *Crutchfield v. Atlas Offshore Boat Service, Inc.,* 403 F.Supp. 920, 921 (E.D.La.1975) (approving an express contract for indemnification between a nonvessel and a stevedore). *But cf. Gould v. General Mills, Inc.,* 411 F.Supp. 1181 (W.D.N.Y.1976) (third party plaintiff's claim for breach of implied agreement to indemnify co-stevedore without fault not barred as a matter of law).[3]

To hold otherwise would thwart the legislative purpose of the 1972 amendments to strictly limit the liability of the stevedore-employer to his obligation under the workmen's compensation aspect of the Act and to insulate the employer against third party claims. *See Bloomer v. Tung,* 586 F.2d 908, at 912 (2d Cir. 1978); *Cella v. Partenreederei MS Ravenna,* 529 F.2d 15, 20 (1st Cir. 1975); *Landon v. Lief Hoegh & Co.,* 521 F.2d 756, 761–763 (2d Cir. 1975) *cert. denied sub. nom. A/S Arcadia v. Gulf Insurance Co.,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642, *rehearing denied,* 424 U.S. 935, 96 S.Ct. 1150, 47 L.Ed.2d 343 (1976). Beyond that, any requirement of indemnification to the outsider from the hand of the employer under the concept of implied warranty would cast the employer in the role of an adversary against the employee's recovery from a third party responsible for his injury. *See Bloomer v. Tung, supra,* 586 F.2d at 910. The community of interest which the employee and his employer share in litigation against the third party under the Act would be impaired by the revival of conflict of interest problems that prevailed in the circuity of claims under the Act before it was amended.

The Clerk will enter judgment for the third party defendant Great Lakes Associates, Inc., on the third party complaint of International Multifoods Corp. and dismiss the third party action. It is so ORDERED.

---

**2.** (21) The term "vessel" means any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member.

33 U.S.C. § 902(21).

**3.** *Gould* was decided without the benefit of the later decision in *Zapico,* 579 F.2d 714 (2d Cir. 1978). *Gould* also held "that subsection 905(b) is limited in its applicability to cases involving an action against a 'vessel' for injury caused by the negligence of the 'vessel.'" Whether International comes within the definition of a vessel is not essential to a decision here. On this point, however, *Hartnett v. Reiss Steamship Co., supra,* 421 F.2d at 1017, is instructive.

International was engaged in operating unloading machinery—the leg—inside the hold of the ship; more importantly, in order to operate the machinery it was necessarily in partial control of the ship.