**Mack L. BROCK**

v.

**BAROID DIVISION OF NATIONAL LEAD CO. et al.**

**Civ. A. No. 15332.**

United States District Court,
W. D. Louisiana,
Monroe Division.

Feb. 4, 1972.

Theus, Grisham, Davis, Leigh & Brown, J. C. Theus, Monroe, La., for plaintiff.

Davenport, Files & Kelly, William G. Kelly, Jr., Monroe, La., for Coral Drilling and American Motorists.

Terriberry, Carroll, Yancey & Farrell, Francis Emmett, New Orleans, La., for Baroid Division of National Lead and Cheramie.

Hayes, Harkey, Smith & Cascio, Thomas M. Hayes, Jr., Monroe, La., for Shell Oil Co.

## MEMORANDUM OPINION

PUTNAM, District Judge.

Plaintiff, Mack L. Brock, a citizen of Louisiana, was employed by Coral Drilling Company as a roustabout to perform general labor in connection with the drilling of an oil well on a stationary platform located on the outer continental shelf in the Gulf of Mexico, off the Louisiana Coast. He brought this suit originally against Coral Drilling Company and its insurer, American Motorists Insurance Company, under the Jones Act and general maritime law. Both of these entities are foreign corporations qualified to do business in this state. They will be referred to hereinafter in the singular, simply as Coral.

Coral was under contract to Shell Oil Company (Shell), for the drilling of the well in question. Shell was to furnish certain supplies, including drilling mud, necessary in the operation. Shell purchased mud from Baroid Division of National Lead Company (Baroid) to be delivered by the latter f. o. b. the rig.[1] Plaintiff was injured while engaged in the work of unloading drilling mud from the M/V Baroid Rocket. While it was Shell's responsibility to supply the mud, it was Coral's obligation to furnish all personnel to do whatever work was necessary in connection with the operation of the rig, including the furnishing of roustabouts to unload bagged drilling mud from supply boats such as the M/V Baroid Rocket, and Coral was so engaged at the time of plaintiff's injury.[2]

Baroid owned the M/V Baroid Rocket, but contracted with Cheramie Boat Company, Inc. (Cheramie), a Louisiana corporation, to furnish a crew and operate the vessel. Baroid has assumed the defense of Cheramie, and agreed to indemnify it if cast in judgment. Hereinafter we refer to these two parties simply as Baroid.[3]

By supplemental petitions plaintiff joined Baroid, Cheramie and Shell as defendants. His claims against Coral under the Jones Act and general maritime law were dismissed, and thereafter Coral intervened, claiming reimbursement for $5,586.17 in medical payments and $8,470.00 as compensation paid to plaintiff under the Longshoremen's and Harbor Workers' Compensation Act, Title 33 U.S.C.A. § 901 et seq. Baroid cross-claimed against Coral and Shell for indemnity. Shell cross-claimed against Coral for indemnity under the terms of its contract, and against Baroid for breach of its obligation to deliver the mud safely to the rig. The parties agreed by written

1. Stipulation between Shell, Baroid and Coral, October 12, 1971, filed October 14, 1971.

2. Stipulation between all parties, filed October 14, 1971.

3. Id.

stipulation (1) that the above-stated amounts claimed by Coral were correct up to and including October 10, 1971, (2) that Coral should be dismissed as an original defendant, but (3) remain in the lawsuit as third party defendants in connection with the third party demands of Baroid.[4]

On November 12, 1970 Brock filed his third supplemental complaint joining Cheramie as a defendant, and at that time expressly waived trial by jury. While Baroid Division of National Lead Company is a foreign corporation, as is Shell, joinder of Cheramie destroyed diversity of citizenship between the parties. Our jurisdiction vests under 28 U.S.C.A. § 1333. We consider the suit to be in admiralty without the necessity of an identifying statement under F.R. Civ.P. Rules 9(h) and 14(c).

 Coral requested trial by jury on February 1, 1971. Due to the fact that the complaint and all incidental demands between the defendants are in admiralty, Coral did not have a right to jury trial. See Watz v. Zapata Off-Shore Company, 5 Cir. 1970, 431 F.2d 100, at 117 et seq. Moreover, the demand for jury trial was late, as more than ten days had elapsed from the time that plaintiff withdrew his demand for a jury and the date Coral first made its request therefor. F.R.C.P. Rule 39(b). We hold Coral's objection on this score to be without merit.

As has been noted, many of the pertinent facts have been stipulated. The evidence heard at the trial deals almost entirely with the circumstances leading up to and surrounding plaintiff's injury. We find the facts set out below in memorandum form to be established by a preponderance of the evidence in the case.

The M/V Baroid Rocket was loaded for this trip at the Mayronne Dock in Venice, Louisiana, on November 15, 1968. The vessel was in charge of Captain Hoyt Bergeron, whose duties included responsibility to direct the dock hands in securing and locating the deck cargo,

some 500 sacks of drilling mud or gel, each weighing 100 pounds, on the deck so as to stabilize the vessel. It was his custom to load deck cargo as far forward as possible, up to the smokestack located behind the wheelhouse. In addition to the sacked mud, the boat also took on 150 tons of dry mud, carried below decks in compartments. The deck cargo was double stacked on wooden pallets, with varying estimates of from 35 to 50 sacks per pallet. It was not covered with tarpaulins or lashed to the deck to prevent shifting in the event of heavy weather, although this method of securing mud topside was sometimes employed. In fact, no steps were taken to make it fast. Captain Bergeron stated that he did not ordinarily direct the loaders to make his deck cargo fast, because if it was too rough he didn't go out. These were usually short runs.

The vessel got underway at 1800 hours on November 15th. The ship's log for that day shows winds were blowing from the south at from twenty to thirty knots and seas were running from 6 to 8 feet high. She reached the platform at approximately 2400 hours, or midnight, and tied up port side to, with her stern into the wind. During the trip to the platform the deck cargo shifted considerably. Sacks of mud fell from the pallets to the deck, the pallets themselves shifted together, a few of the stacks were leaning. Some of the sacks that fell to the deck were broken. Captain Bergeron and his crew began discharging the bulk cargo by means of pumps located on the vessel in the early hours of November 16. Brock was awakened at about 0100 on that date by Emery Sonnier, Coral's crane operator and roustabout foreman (pusher), and along with other members of the roustabout gang on the platform, assembled at the crane to begin unloading the deck cargo. The ship's log for November 16 shows that when the Baroid Rocket departed the platform at approximately 0830 on that date, the wind had increased to twenty

4. Id.

to forty knots, and seas were running up to 12 feet high.

Brock and one Charles Dunaway were directed by Sonnier to descend to the deck of the supply boat to unload the sacked mud. They were lowered by Sonnier on a personnel basket, using the platform crane. Before beginning work, while he was on the personnel basket just before being lowered to the deck, plaintiff suggested to Sonnier that the weather was rough. The condition of the deck cargo was visible from the platform, and the pusher could see that some water was washing over the stern, through the bulwark. At the time Brock expressed his concern about the weather, Sonnier remarked that if the supply boat could tie up he would unload it. The deck area of the Baroid Rocket was adequately illuminated. Brock, Sonnier and Dunaway knew when they started that the mud would have to be restacked on the pallets before it could be lifted.

Because most of the spilled sacks were toward the stern and the greater part of the remaining cargo was stacked forward to a point just behind the wheelhouse, Sonnier directed Brock and Dunaway to spot the pallets to be reloaded in the open space between the cargo and the stern.[5]

The bulwark was about three feet high at the stern, according to the deposition of Captain Bergeron. From photographs of the ship (Exhibits P–2, P–3), it can be seen that it was a solid plate extending completely across the stern, but approximately one foot from the level of the deck to the bottom of the bulwark was open. The captain also testified that the vessel's freeboard at the stern varied from two to four feet, according to the load she was carrying. While he had no recollection of this particular trip, he said that waves running from 6 to 12 feet high would come over the stern, if the vessel moored stern to. The stack, radio and radar antennae and wheelhouse prevented unloading over the bow, which would have been the case if he had moored with a bow line only with the ship's bow heading into the sea. However, when coming alongside a fixed platform he would, if possible, try to moor with both bow and stern lines. This is the manner in which the M/V Baroid Rocket was moored to the Shell platform when this accident occurred.

The captain also testified that he had nothing to say about how the rig crew worked the deck cargo, and did not supervise them. But, he further testified that he and he alone decided whether or not it was too rough to put the vessel alongside the rig safely and, if in his judgment the operation could not be undertaken safely, he had authority to stand off from the rig until it was safe to do so. After carefuly reading his testimony we must conclude that he knew the deck cargo had to be unloaded by the rig personnel; that the seas were running from six to eight feet high at a minimum when he reached the rig on November 15 (which both he and Sonnier testified was normal for that time of year); that he did not approach the rig with his bow into the wind when he came alongside the platform but, on the contrary, tied up with bow and stern lines on a downwind heading, leaving the stern of the vessel to take the seas which he knew would wash over the after deck, where the rig personnel would necessarily have to work.

After the vessel tied up in the manner we have described, Brock and Dunaway were lowered to the deck. All of the mud sacks had to be reloaded on the pallets so that they could be safely lifted

---

5. In reaching this conclusion we are aware of Brock's testimony that the cargo was located near the stern on the port side of the Baroid Rocket. See exhibit Brock 1. However, this drawing is not to scale, and plaintiff testified later that the reloading of the pallets was done toward the stern because that was where the spilled sacks were. Moreover, his recollection of the vessel was vague, he could not recognize it from the photographs, identified in globo as P–3, at the trial. Dunaway and Sonnier both testified that most of the cargo was forward and that there was about 25 feet of open space toward the stern.

to the platform. The weather continued to build up, and the seas increased. Waves came over and through the stern bulwark frequently. The drilling mud or gel from the broken sacks, when wet, made the deck slippery and footing difficult. To avoid having to carry the 100 pound sacks across the deck under these conditions, Brock and Dunaway "spotted" the pallets toward the stern, closest to the spilled sacks. When plaintiff sustained his injuries he had picked up a sack of drilling mud and was in the act of placing it on one of the wooden pallets when a heavy wave came over the stern. The water lifted the pallet and drove it toward Brock, pushing him backward, still holding the sack, some eight to ten feet. He backed into another pallet of stacked mud, striking his back and part of his leg, at which time he says he slumped down and dropped the sack of mud he was holding. He did not fall to the deck.

Brock says he did not think he had suffered any severe injury, although he felt some pain in his back and leg. He continued working until 0600 or 0630 hours when the cargo was unloaded, then went back up to the platform in the personnel basket. Sonnier saw the accident happen, as did Dunaway. When Brock returned to the platform Sonnier asked him if he had hurt himself, and he replied that he did not think so. After he had rested, plaintiff testified that he felt bad; he was aching, and he told Dunaway and another roustabout that he would have to go ashore. The same day he also told Mr. Hutchinson, his toolpusher and Coral's highest ranking representative on the rig, that he had to see a doctor, and was told to go in. He did not tell Mr. Hutchinson that he had been injured. In fact, Hutchinson testified that he was under the impression at the time that Brock requested to be sent in because he was sick with chills and fever. However, he could not recall the entire conversation with Brock. On November 17 he left the rig by helicopter and returned to his home.

Under these facts the conclusion is inescapable that the deck cargo of the Baroid Rocket was improperly and carelessly loaded in that no steps were taken to secure it to prevent shifting resulting from wave action or other causes, which is precisely what occurred. Because of the improper stowage, a dangerous and unseaworthy condition existed at the time the vessel tied up, inimical to the safety of the roustabouts who would be called upon to unload it. For aught that appears in the record, the captain and crew of the ship disappeared into the comfort and tranquility of the deck house or some other area below decks where the pumping operation was conducted. Further, the weather continued to build after Coral's men began unloading the vessel, yet the captain's silence remained unbroken.

Roustabouts are not specially trained in loading and unloading vessels as are longshoremen employed by contract stevedoring companies. These men perform all types of labor required of them in drilling operations, excepting only the work done by the drilling crew. On occasion they might even be called upon to substitute for one of the roughnecks on the derrick floor, but this is not usually the case. One of their duties is to unload supplies sent out to the platform by supply boats. While so engaged they are performing services for the benefit of the vessel and the accomplishment of its mission, and fall into that class of workmen entitled to the benefits of the shipowner's warranty that the vessel, its cargo and appurtenances are seaworthy. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Pope and Talbot Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143.

Moreover, under Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed. 2d 550, the shipowner owes them the duty of exercising reasonable care for their safety while aboard the vessel in furtherance of the interests of the owner.

Thus, it is now settled that a shipowner which has entered into a contract requiring the presence of the employees of an independent contractor aboard its vessel to perform functions essential to maritime service owes those workmen the nondelegable duty to provide a reasonably safe place to work. Seas Shipping Co. v. Sieracki, supra, Mahnich v. Southern S.S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Crumady v. Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413; Lusich v. Bloomfield Steamship Co., 5 Cir. 1966, 355 F.2d 770.

■ At this point we must consider that the parties to this action were not in the comparative safety of a harbor, secured to a dock, with all modern appliances and equipment designed to discharge cargo as is usually the picture framed by the conventional longshoreman v. shipowner v. stevedore situation. Here there is no written contract between Shell and Baroid, only the stipulation that the well owner purchased Baroid's product to be delivered f. o. b. the rig. Implicit in this agreement, however, is the obligation to perform this engagement with due diligence and in a seamanlike manner, which necessarily includes the duty to perform in a nonnegligent manner. Coral, as drilling contractor, was bound by a detailed written contract to exercise all dispatch in drilling the well to completion. Time was of the essence of the undertaking. The drill site was atop a man-made platform located in the open gulf.[6] Captain Bergeron, an experienced boat operator, knew or should have known all of these facts had he exercised the care and prudence required of him by his occupation.

When the Baroid Rocket tied up alongside the platform, Sonnier, Coral's crane operator and roustabout foreman, proceeded to commence unloading the cargo without delay. From his position, forty or fifty feet above the vessel, he determined that the cargo had shifted and scattered about the deck and that it would have to be restacked on pallets before lifting. Apparently there was no communication with the vessel; but, in our judgment, Sonnier could assume that the captain would not have come alongside if it were not safe to unload. Indeed, Bergeron said that he would not have done so had there been any danger to the vessel or its crew. All of the Coral hands knew that the cargo would have to be restacked on the pallets before it could be lifted. They also knew that there was danger of injury because of the wet and slippery deck. Baroid contends that in proceeding with the work and in placing the pallet toward the stern, when they knew that water was coming over the stern, they were courting disaster, and that this failure to exercise ordinary care by Coral was a breach of its implied warranty of workmanlike performance under its contract with Shell, and the sole proximate cause of Brock's injury.

■ We think not. We agree, as Baroid contends, that Coral stood in the relation of stevedore to the vessel under its contract with Shell, and that Brock was a Sieracki seaman. Upon the arrival of the supply boat Coral had a choice to make—whether it should proceed to unload by correcting the unseaworthy and dangerous conditions existing on the deck of the Baroid Rocket, or refuse to unload and call upon the captain and crew to remedy the conditions before proceeding with the work. Olin Mathieson Chemical Corp. v. United Stevedoring Division, States Marine Lines, Inc., 5 Cir. 1970, 432 F.2d 1234, affirming 317 F.Supp. 1373; T. Smith & Son, Inc., v. Skibs A/S Hassel, 5 Cir. 1966, 362 F.2d 745; Burrage v. Flota Mercante Grancolombiana, S.A., 5 Cir. 1970, 431 F.2d 1229, at 1232, and authorities there cited.

Under the facts of this case, reporting the condition of the deck to the boat's captain would have merely called his attention to a fact that he already knew.

6. The contract is attached to the stipulation of October 12, 1971, supra, n. 1.

Having to restack drilling mud on the pallets prior to lifting it to the platform was not unusual, according to Sonnier. Thus, when Sonnier elected to proceed he was following the practices of the industry and fulfilling the obligations Coral owed Baroid under its contract with Shell by undertaking to remedy the condition which Baroid's neglect had brought into being initially.

■ Brock and Dunaway, on Sonnier's instructions, began to reload the pallets toward the stern and actually spotted the pallets there for Sonnier. Here there was a choice between two evils—load where the sacks were located on the deck, at the risk of water coming over the stern and possibly knocking the pallets about, or spot the pallets closer to the bulk of the stacked cargo some ten or twenty feet forward, and risk injury from falling on the wet deck, made more slippery by spilled drilling mud, while carrying hundred-pound sacks across the greater distance. We cannot, under these facts, say that there was a lack of ordinary care and prudence on the part of Sonnier, Brock or Coral, in electing to place the pallet in close proximity to the fallen cargo, and we now hold that their conduct in doing so was not negligent. We also conclude that, in this semimaritime oil field, there was no breach of the warranty of workmanlike performance imposed upon Coral under the doctrine of Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corporation, 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, a matter we will discuss further infra.

■ It follows that the proximate cause of Brock's injuries was the unseaworthy condition of the deck of the Baroid Rocket at the time of his injury, resulting from the improper loading of the cargo the day before at Venice, without securing it in any way, compounded and aggravated by the negligence of the captain in mooring the vessel port side to, with her stern to seas running six to twelve feet in height, knowing that when he did so, the roustabouts from the platform would have to work restacking his cargo under the conditions that prevailed at that time and were becoming worse progressively.

From what we have said, Baroid's plea of contributory negligence on the part of plaintiff is rejected.

We will not detail the medical evidence. Plaintiff called his family physician, Dr. Courtman, when he arrived at his home for an appointment and was seen by him on November 25. He found him to be suffering from a right inguinal hernia, with sensitivity in the low back area. He gave a history of having strained his back on November 16, while picking up a heavy object. Dr. Courtman x-rayed the back, and prescribed muscle relaxants. From November, 1968, until November 20, 1970, Dr. Courtman saw Brock on numerous occasions, and testified that his complaints of back pain were persistent. He operated on him and repaired the hernia in August, 1969. The delay in operating for the hernia was due to plaintiff's back condition and the fact that his employer did not authorize the operation until then. In December of 1968 he referred Brock to Dr. Cannon, an orthopedist, who recommended a myelogram, but plaintiff refused it. His back pain at that time and from the date of his first visit to Dr. Courtman was described as moderately severe and localized in the low back area. Dr. Cannon fitted him with a brace and prescribed conservative treatment for his back, with medication for pain. In April, 1969, Brock again told Dr. Courtman that he did not want a myelogram, or any further treatment for his back. He was very nervous and Dr. Courtman prescribed tranquilizers.

In March and April of 1970, Brock returned to Dr. Courtman complaining of a sudden swelling of his right foot and leg. He had worked some six weeks as a roustabout for Dresser Offshore, a division of Dresser Industries. Brock himself testified that he had attempted to return to work in February and May of 1970, but was unable to continue be-

cause of his back and leg. He did not sustain any additional injury during this period.

Finally, in June, 1970, plaintiff was seen by Dr. Rambach, an orthopedist in Shreveport, Louisiana. It was the opinion of this doctor that he had a disc injury caused by the incident of November 16, 1968. He performed surgery on July 22, 1970, during the course of which he discovered a problem was at the L4–L5 disc level. This was corrected, but Brock continued to complain of pain. In June, 1971, following repeated examinations and complaints of pain, a second myelogram was performed, which showed a defect at the L4–L5 level. Dr. Megison, a neurosurgeon associated with Dr. Rambach, performed a second operation on June 22, 1971, at which time he freed the nerve roots which were being pinched by scar tissue. Plaintiff still suffers with his back and leg and continues to take mild medication. Both Dr. Rambach and Dr. Megison were of the opinion that plaintiff is permanently disabled from performing any kind of manual labor and that he will continue to suffer some degree of pain that will require mild medication. There is no other medical treatment available.

■ At the time of his injury plaintiff was forty-three years and eleven months of age. At time of trial he was lacking two months of being forty-seven and he had missed two years and eleven months of work due to the accident. He has a fourth grade education, and has worked at various jobs during his lifetime, all of which required manual labor. He has no skills. For several years preceding the injury he worked as a roustabout and roughneck in the oil fields and offshore oil industry of Louisiana. In the year he was injured he earned $528.13 working for Monroe Well Service, and in February or March went to work for Coral and during the remainder of that year continued in this employment until November 16. His total earnings in 1968 were $6821.23. In 1967 he earned $4416.75, and in 1966, $4116.50. There is evidence in the record that the hourly rate of pay for roustabouts has increased from $1.75 to $2.00, that Brock was a good worker and, while the work was irregular, he was kept employed on a fairly regular basis. We find that a fair assessment of his earning capacity is $6000.00 annually, or $500.00 per month.

He has lost wages up to the time of trial in October, 1971, totaling $17,500.-00. His life expectancy is 25.6 years and the average number of remaining years of labor force participation was approximately 18 years, according to statistics compiled by the United States Department of Health, Education and Welfare. He is totally disabled. On this basis, discounted at 6% per annum, which we find to be a fair investment yield on today's money market, his loss of future earnings would be approximately $64,-980.00. In addition to loss of past and future wages, there is no doubt that this man suffered considerably and that he has experienced more than a little anxiety, worry and mental distress as a result of this accident. He will also have future medical expenses for analgesic drugs to alleviate the pain he still experiences in his back and leg. Past medical expenses have amounted to $5,586.17, and this sum, plus an aditional $50,000.-00, will adequately and fairly compensate him for these items. He is entitled to judgment in his favor for the total of these amounts, viz:

1. Loss of past wages to time of trial . .$17,500.00
2. Loss of future earnings, discounted
 to today's value .............. 64,980.00
3. Past medical expenses ........... 5,586.17
4. Past and future pain and suffer-
 ing, physical and mental ....... 50,000.00

 Total ................$138,066.17

Judgment will be rendered in his favor against Baroid for this amount.

## II. *Coral's Intervention*

■ Coral is entitled under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 933, for reimbursement of $5,586.17 in medical expenses heretofore paid, plus compensation payments at the rate of $70.00 per

week which, at the time of trial totaled $8,470.00, plus payments made to date. Judgment will accordingly be rendered entitling Coral to reimbursement as prayed for in its petition of intervention.

## III. *Baroid vis-a-vis Shell*

On the day of trial Baroid, Coral and Shell filed a written stipulation as mentioned above, under which Baroid's cross-claim must fall. It is clear that Coral was an independent contractor and that Shell is without liability in this case. Shell's cross-claim against Baroid for attorneys fees and costs is deferred in keeping with the agreement reached at the pretrial conference on September 29, 1971.

## IV. *Baroid v. Coral*

This demand is predicated upon the Ryan doctrine of indemnity which we have discussed somewhat in passing on the issues presented by Brock's main demand. Our findings absolve Coral from negligence or blame, but the theory of indemnity advanced by *Ryan*, supra, and cases subsequent thereto, principally Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491, make it clear that the right to indemnification afforded the shipowner against the employer of a Sieracki type seaman is founded upon the express contractual undertaking of workmanlike performance implicit in the classic relationship of shipowner and stevedore. Only recently has this circuit come to grips with the problem as it relates to personnel employed to render specialized services aboard a special purpose vessel such as a submersible drilling barge. In Whisenant v. Brewster-Bartle Offshore Company, 5 Cir. 1971, 446 F.2d 394, the court recognized and applied the doctrine to allow recovery over against the employer of a workman killed aboard a Brewster-Bartle drilling barge while testing drill pipe employed in the drilling of a well. The Court said:

". . . we are convinced that the doctrine was properly applied in this case. The court found that (1) in contracting to perform services beneficial to the vessel, Loomis (employer) warranted to perform in a workmanlike manner; (2) Loomis' unsafe procedure and plan for "rigging up" the vessel rendered it unseaworthy, Loomis breached its implied warranty of workmanlike services and was therefore obligated under Ryan to indemnify the barge owner for any damages sustained as a result . . ." (446 F.2d 394, 400)

In the present case, we have seen that Coral's undertaking was primarily the drilling of an oil well under contract to Shell. The unloading of supplies was incidental to this operation, and the personnel used for this purpose, roustabouts and an experienced crane operator, were not specialists or expert in the business of loading and discharging cargo. Nevertheless, performance of the work at hand was Coral's obligation and it carried with it the warranty of workmanlike service, which, if breached in such a manner as to visit liability upon the vessel owner for injuries resulting from the latter's nondelegable duty to furnish a seaworthy vessel by creating or bringing a condition of unseaworthiness into play, requires that it must indemnify the owner, unless the owner has itself been guilty of derelictions in its reciprocal contractual duties which preclude its recovery. It is contractual in nature. Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., supra; Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., supra; Waterman Steamship Corporation v. David et al., 5 Cir. 1965, 353 F.2d 660; Olin Mathieson Chemical Corp. v. United Stevedoring Division, States Marine Lines, Inc., S.D. Tex. 1969, 317 F.Supp. 1373, aff'd per curiam, 5 Cir. 1970, 432 F.2d 1234. See generally, Restatement of Contracts (First), §§ 295, 315; Corbin on Contracts §§ 571, 947 and 1264. We have concluded that the sole proximate cause

of Brock's injuries in this case was the unseaworthiness of the vessel brought into play by Baroid's faulty loading before leaving port, and mooring stern to the sea.

■ Assuming for the sake of argument (which we have expressly rejected), that Coral did breach its warranty of workmanlike performance when it elected first to unload the vessel under the prevailing circumstances, or secondly in locating the pallet near the stern of the vessel and that it was foreseeable that the dangerous and unseaworthy condition of the Baroid Rocket might result in liability to her owner because of its absolute liability to Brock for injury caused thereby, under the concepts of contract law forming the basis for the Court's limitation of the *Ryan* doctrine pronounced in Weyerhaeuser, we would be required to hold that the conduct of the owner "was sufficient to preclude recovery." Waterman Steamship Corp. v. David, supra. Baroid's negligent and improper loading of the deck cargo, and the complete indifference shown by Bergeron for the safety of Coral's roustabouts in mooring the vessel as he did, amounted to a substandard performance of its side of the bargain of such a nature as to hinder, obstruct or delay, if not absolutely prevent, Coral from doing otherwise. Indemnity is, therefore, precluded.

For these reasons, we deny Baroid's claims against Coral.

### Shell vis-a-vis Coral

Shell has filed its claim against Coral for indemnity under the provisions of the drilling contract. This right is conditioned upon Coral's negligence, which we find lacking in this case. No indemnity in the form of reimbursement for costs and attorney's fees is forthcoming.

Judgment is rendered in accordance with the foregoing with interest at the rate of seven (7%) per cent per annum in favor of plaintiff, Mack L. Brock, from date of entry until paid.